EBENEZER Z. RYAN, Surviving Assignee of the Bank of Illinois, Plaintiff in Error, *v.* JAMES DUNLAP *et al.*, Defendants in Error.

### ERROR TO GALLATIN.

The cashier of a bank acting in conformity with the practice and rules of the institution, may release a debt secured by mortgage in its favor. Nor need such release be under seal.

A mortgagee, being a banking institution by its agent and servants, may do all such acts in respect to the debt as usually may be done in money transactions, verbally or in writing, without regard to the mortgage security.

A transfer of a debt secured by mortgage, by assignment or delivery, would generally carry the mortgage in equity, and payment of the debt will discharge the lien.

Payment of a debt secured by mortgage may be made otherwise than by the delivery of money, and the entry of satisfaction on the margin of the record of the mortgage is not required as prescribing a rule of evidence.

Under the act of 25th February, 1843, the officers of the Bank of Illinois had all necessary powers to settle up and close its affairs, by receiving and releasing debts due to it.

Corporations are presumed to have agents and servants acting for them in the usual course of dealing within their powers; and their acts should bind their principals.

THE following statement will exhibit the principal facts involved in this controversy:

On the 19th day of February, 1840, John C. Stickney being seized in fee of lots 1111 and 1112, in Shawneetown, mortgaged the same to the Bank of Illinois, to secure debts then due by Stickney to the bank, and advances to be thereafter made by said bank to Stickney, for the purpose of enabling him to finish off a house then in process of construction upon said lots; the whole debt and advances not to exceed the sum of $12,000. A note was executed and delivered for that amount, and is recited in said mortgage. The mortgage was recorded March 10, 1840. On the 29th day of December, 1840, Stickney conveyed said lots in fee to E. H. Gatewood, and the deed was recorded January 12th, 1841. On the 16th day of June, 1842, Gatewood mortgaged the same lots to James Dunlap, to indemnify him as surety on a bail bond, which mortgage was recorded July 11th, 1842. On August 8th, 1842, the suit in which bail bond was given was compromised, and the notes of Gatewood taken in satisfaction with Dunlap as surety. In 1847 these notes were paid by Dunlap, and he claims indemnity under the mortgages. On July 1st, 1842, Gatewood mortgaged the same premises to Newcomb & Co., reciting the mortgage made by Stickney to the bank; this mortgage was recorded July 16th, 1842. On the 9th day of May, 1845, Newcomb & Co. assigned their mortgage to W. & C. Fellows, without recourse. May 4th, 1843, the bank, by Dunlap as president, gave a power of attorney to A. G. Caldwell to release mortgages when satisfied, which power was recorded May 22d, 1843. On the 19th day of August, 1843, Gatewood executed and delivered to the bank, James Dunlap being then president, his note for $15,280, the amount then due on the Stickney mortgage, and executed and delivered a mortgage on the same lots and other property previously mortgaged to the bank to secure the payment of the note; the Stickney note was surrendered with an indorsement signed by John Siddall, cashier, but in Caldwell's hand-writing, stating that the note had been paid by Gatewood, and on the same day Siddall released the mortgage from Stickney to the bank. There was no payment in fact of the Stickney mortgage. On February 25th, 1843, the act was passed to "put the Bank of Illinois in liquidation," to take effect March 3d, 1843. On the 25th February, 1843, a supplemental bill was passed and accepted by the bank, by virtue of which the prior act was suspended for four years, and by which the bank was to "*be finally wound up according to the rules and regulations hereby established;*" and the bank was prohibited from "loaning" any money, "but shall confine all its operations to winding up its affairs, *collecting* and

*securing* its debts." A supplemental act was passed February 28th, 1845, vesting the effects of the bank in assignees, &c., with power "to collect all debts due to said bank." Under this act Dunlap, as president, assigned the effects of the bank to Caldwell and Ryan. When the substitution of the Gatewood for the Stickney mortgage took place, Dunlap was president and Gatewood a director of the bank. John Crenshaw, who was a director of the bank, swears that in 1843 the board voted the substitution and directed the surrender and release. It does not appear that there was any record of this vote. It is not shown that there was any by-law of the corporation which authorized Siddall, as cashier, to enter satisfaction of mortgages, though he had done so before the power was given to Caldwell; but there is no proof of any such releases since the record of Caldwell's power. The records of the board show no power in Siddall to release, nor does the charter vest any such power in the cashier. Gatewood died on February 27th, 1848. Dunlap and W. & C. Fellows & Co. file separate bills of foreclosure, and make the assignees of the bank parties defendant.

The indorsement on Stickney's note, made and signed by Siddall, the cashier of the bank, was as follows: "This note is paid and satisfied by E. H. Gatewood, this 19th August, 1843."

The decree in this case was ordered by MARSHALL, Judge, at August term, 1853, of the Gallatin Circuit Court, and directed the sale of the property in controversy, and the division of the proceeds; but did not recognize that Ryan as assignee had priority or preference, by virtue of the mortgage executed by Stickney in 1840; the notes which that mortgage was given to secure having been declared canceled by Siddall, the cashier of the Bank of Illinois.

W. THOMAS, for Plaintiff in Error.

S. S. MARSHALL and R. S. NELSON, for Defendants in Error.

SCATES, C. J. The only question presented is simply one of priority of mortgage lien. But its solution involves two other questions: first, whether the mortgage under which plaintiff claims that priority was paid and discharged. Second, the powers of the board of directors and cashier to discharge it, in the manner shown by the record.

We are of opinion with the defendants upon all these questions, and will state some of the principles and reasons which we think support that conclusion.

The mortgage debt is the principal thing and the mortgage a mere incident of it. *Coffing et al.* v. *Taylor*, 16 Ill. R. 472;

*Warner et al.* v. *Helm et al.*, 1 Gil. R. 231; 1 Hilliard on Mortg., Cap. 11, pp. 163, 164; 1 Hilliard on Real Prop., Cap. 33, pp. 418, 419; *Martin* v. *Mowlin*, 2 Burr R. 969.

The mortgagee, and his agents and servants, may deal with and do such acts in respect to such debt as may be usually done in relation to money transactions, verbally or by writing, without regard to the mortgage security. A transfer of the debt by assignment, or delivery of the note, would generally carry the mortgage in equity, and payment would discharge the mortgage lien. The necessity of acting under seal in relation to such a debt, depends upon the nature of the act as affecting the mortgage security or the title to the land, by assignment or release of the mortgage security. And this would be equally the case with individuals as with corporations. But so far as power and mode of action is concerned in transferring or collecting the debt or the note given for it, I know of no difference between one secured by mortgage and one not so secured. Its transfer or payment is a mere question of fact and intention as if no mortgage existed, and the rules of law and evidence and the power of the parties the same. Its existence might assist in explaining and ascertaining their intention as evidenced by particular acts, but cannot vary or control their power or mode of dealing with or settling the debt. A formal release of this mortgage should be under seal, but such a release would not discharge the debt. On the contrary a verbal or written discharge of the debt by its payment in money, property or other securities, would discharge the mortgage, and without a release or satisfaction entered upon the mortgage itself or the margin of the record, as provided by Rev. Stat. p. 110, Sec. 37. The provision is made for the protection of mortgagees and others, by the recording and preservation of evidence of satisfaction of it, on the same public record; and not as prescribing a rule of evidence.

What then may be alleged and sustained as payment? It is not a technical term importing the delivery of money. It may be made in property or other securities. It is a question of fact, of the meaning and intention of the parties. The proofs here leave no question of the intention. It was Stickney, not Gatewood, who owed and was bound to the bank for this debt. Gatewood, it is true, had purchased subject to the bank lien, but he owed the bank nothing on it; he was bound to Stickney, not the bank. Stickney desired to be released by payment of his debt to the bank. The bank proposed to release Stickney if Gatewood would give his note for the debt and interest due from Stickney, with a mortgage on the same and other property. This was agreed to and done, and Stickney's notes and mort-

gage receipted and delivered up to him, and satisfaction entered on the margin of its record in the recorder's office by the cashier of the bank.

The entries in the books of the bank and two of its directors prove the intention to comport with these acts, as a total discharge of Stickney's debt without any reservation of the mortgage security to meet Gatewood's new liability secured by his mortgage of the same and other property.

It would require an express agreement to rebut such clear proof of payment. The doctrine of the mere renewal of mortgage notes by the mortgagor or others, continuing under the mortgage security, is no answer to such facts as these.

I need not review the various cases of payment by giving higher or other securities by the debtor, or the bills or notes of third persons. A satisfactory summary will be found in 2 Greenleaf Ev., Secs. 516 to 523, and well sustained by the references; 7 Mass. R. 286; 2 Metcalf R. 168; *Allard* v. *Lane*; 18 Maine R. 9; 21 Pick. R. 230; 6 Cow. R. 301; *Hadlock* v. *Bullfinch et. al.*, 31 Maine R. 246; 5 Wend. R. 85; Hilliard on Mortg. 306, 307 and notes, p. 310 paragh. 12; 12 Johnson R. 409; *Barnes* v. *Carmack et. al.*, 1 Barb. S. C. R. 392. There is no proof of bad faith or false representations. If there was any mistake in canceling a prior and taking a junior lien to other incumbrancers, it was the fault and carelessness of the bank in not examining the records and title. They shall not be heard to allege this to the prejudice of Stickney and Gatewood.

The remaining question is as to the powers of the bank or agents and officers of the bank to make this agreement and cancellation of one debt and mortgage and take another in payment. It is needless to discuss the general doctrine which confines corporations strictly within the delegated powers, and to the objects and means within the charter.

The general powers of the bank for further transactions of general banking were suspended by the Act of 25th Feb., 1843, which declared that the bank should go into liquidation within thirty days from that date. Act 1843, p. 32, Sec. 6. The 7th Section declares that the bank should not exercise the usual banking powers, but should "confine all its operations to winding up its affairs, collecting and securing its debts, paying the debts of the bank, selling its real and personal estate, issuing the certificates for balances, provided for in the sixth Section of this Act, and to renewing the notes of its debtors from time to time, upon the payment of one-fifth part each time, and to suing and being sued, in relation to all its dealings," for which purpose alone its powers and charter were continued for a limited

time.    There were other specific directions and details for the
same object.

This Act seems to be now construed as converting the direc-
tors and officers of the bank into trustees of creditors and
stockholders.    I do not so regard it.    They were no more of that
character after this Act, in the exercise of the powers limited
by it, than before, in the full exercise of their charter powers.
They were still in the management of their own affairs for the
purposes of settling their business.    What they had power left
to do was done in the same character, though for a single object,
as the like acts before the restriction.    The character of those
who managed the settlement of the affairs of the bank was
changed fully by the Act of 1845, when assignees were appoint-
ed in the nature of receivers of the effects of the bank.

It is true, it appears by the evidence, that a loan of money
was a part of this particular transaction for change of debtors
and securities, and which they had no power to make.    But
they had power to make the arrangement to secure the debt by
taking the note and mortgage of one for the debt, note and
mortgage of another.    And in doing so, to exercise their own
best judgment of their interest.    Circumstances and facts,
known and apparent to them, dictated the policy and prudence
of this arrangement.    They acted very negligently in not exam-
ining the title, it is true ; but there is no proof of fraud, design
or overreaching in any one concerned, nor of any bad faith in
Dunlap, who, though president, was not personally concerned as
such, or present, or knowing of this transaction when made.
The principles and doctrines contended for would render bank-
ing and other corporate acts of like general business trans-
actions, wholly impracticable.    Nor do we recognise the
current of authorities at this day as sanctioning the ancient
strictness which required corporations to act in most important
transactions by seal and in writing.    In the varied and multi-
plied transactions of banking, manufacturing, railroad, municipal,
and other corporations, it will be found impossible to provide
their agents with written or even express verbal powers and
instructions for all their acts on behalf of their principals, or
for those dealing with them, to wait to inspect such evidences
of authority.

To a very great extent, like individuals who act through
agents and servants, these corporations are held to presumed or
implied agencies, authority and instruction, to those who are
held out or permitted to act for them in their usual course of
dealing within their charter powers, when not controlled spe-
cially by its provisions, the by-laws, or the nature and character
of the contract or the subject matter of it.    Angell and Ames

on Corp., 268 to 304; Paley on Agency, pp. 310 to 312, Sec. 2; Story on Agency, Secs. 52 to 56, and notes.

Although the English rule has not been relaxed to the same degree, in this respect, as the American, yet the courts have conformed to the wants and necessities of daily business transactions in a very great degree. *Beverley* v. *The Lincoln Gas Light and Coke Co.*, 6 Adol. and Ellis, R. 829; *Church* v. *Imperial Gas Light and Coke Co.*, id. 846; *Mayor of Ludlow* v. *Charlton*, 6 Mees. and Welsb. R. 815.

The cashier is necessarily the general agent of the bank in dealings with customers in money, notes and bills,—the receipt, deposit, transfer and payments of them. It is indispensable to the interests of the corporation, and necessary to the protection and security of customers that he should exercise these powers, and that his acts should bind his employees. Angell and Ames on Corp., 293, (2) to 297; Story on Agency, Secs. 92 to 97, 114, 115.

The cashier acted in this instance within the general scope of his authority in endorsing receipts for payment upon the note, mortgage and record, as evidence of the agreement and discharge between the directors and Stickney, and in delivering them up as paid. Proof is made that he had been in the habit of entering satisfaction of mortgages in the mortgage record for four years previous. The power of attorney to Caldwell to do the same is no revocation of this authority in the cashier.

We do not think the objection sustainable, that the transaction is not proven by minutes of the proceedings of the board. The agreement may be shown by parol when no minute was made or kept,—and that although no formal meeting of the directory was had for the purpose. The transaction was known to them—they acquiesced in and acted upon it.

We are of opinion the mortgage and notes of Stickney to the bank were paid and discharged; and the assignee is not entitled to revive the mortgage as a prior lien.

Decree is affirmed.

*Decree affirmed.*