Irene Compton, Plaintiff-Appellee, v. School Directors of District No. 14, Whiteside County, Illinois, Defendants-Appellants.

Gen. No. 10,858.

Second District.
December 16, 1955.
Rehearing denied January 10, 1956.
Released for publication February 10, 1956.

244

Besse & Besse, of Sterling, for appellants; Kennard J. Besse, of Sterling, of counsel.

Karl Yost, of Morrison, for appellee.

JUSTICE CROW delivered the opinion of the court.

The defendants appeal from a judgment in favor of the plaintiff in the sum of $2,089.10. The case involves an alleged breach of a teacher's contract and was heard by the Trial Court without a jury.

The plaintiff, Mrs. Irene Compton, a teacher, on December 29, 1953, filed her complaint, alleging that she entered into a written contract with the defendant school directors on June 13, 1953, to begin on September 1, 1953 to teach school at the Defendants' Riverdale School in Whiteside County, for the ensuing school year, at a salary of $333 for eight months and $336 for the ninth month and that she continued in the employment until November 6, 1953 when she was discharged by the defendants without cause.

The contract purported to be subject to the school laws of Illinois and the reasonable and lawful regulations of the School Board, purported to have been executed pursuant to a lawful meeting of the Board of Directors held May 6, 1953, and by order of the Board of Directors, and is signed by Louis Schwarz, President, and R. D. Myers, Clerk, Directors, and Mrs. Irene Compton, teacher. The contract recites that she is a legally qualified teacher, and provides, so far as material, that she shall "teach, govern and conduct the common school of said district to the best of (her) ability;

247

—see that the school house, grounds, furniture, apparatus, and such other district property as may come under the immediate care and control of said teacher is not unnecessarily damaged or destroyed;—give playground supervision to all students directly in your (her) charge."

The answer, in substance, so far as material, denied the allegations of the complaint and alleged certain affirmative defenses to the effect the plaintiff breached the contract by not performing it according to the school laws and the reasonable and lawful regulations of the Directors, and that she was dismissed for incompetency or insubordination or other good and sufficient cause. The reply denied the allegations of the affirmative defenses.

The plaintiff received $765.90 for salary through November 6, pursuant to the contract, and following her dismissal and after January 1, 1954 she received $145 from other sources,—Sterling and Rock Falls Schools, —for substitute teaching. The amount of the judgment is for the unpaid balance on the contract, pursuant to its terms, less, in mitigation of damages, the $145 the plaintiff so received for substitute teaching.

The only issues involved on the appeal are (1) was there a valid contract,—the defendants urging that the "ayes" and "nays" were not recorded in the minutes of the Board at the time of awarding the contract,—and (2) was the plaintiff lawfully discharged for insubordination, or incompetency, or other good and sufficient cause,—the defendants urging that the contract, if valid, was terminated for sufficient cause. The plaintiff's position is that the contract is valid, she was discharged without cause, and is entitled to damages for breach of contract.

As appears from the written opinion of the Trial Court, the case was tried below on the theory the plaintiff should prevail unless the defendants sustained their burden of proving she was discharged for reasonable

and just cause,—in other words, the first issue on this appeal, as to whether there was a valid contract, was not too seriously or vigorously urged by the defendants in the Trial Court.

It is apparent that the contract was executed pursuant to action taken at a regular or special meeting, regularly held, of the Directors on May 6, 1953, and by order of the Board; that the plaintiff was discharged within the contractual period; and that she was ready, willing, and able to continue her employment at the time she was discharged. Besides her testimony and that of certain other witnesses, this last is particularly further evidenced by the fact that she refused to resign and did not obtain other employment for a couple of months or so after the dismissal. The contract was admitted in evidence, without objection, and, in addition to the testimony of all the Directors to this effect, it was further stipulated that it was executed pursuant to a meeting of the Directors, regularly held, at which all Directors were present, and at which all voted aye. We are of the opinion that, under the circumstances, she has proved a valid existing contract.

The statute (Ch. 122, Ill. Rev. Stats., 1953, pars. 6—9, 6—10 [Jones Ill. Stats. Ann. 123.783, 123.784]) provides, so far as material, that no official business shall be transacted by the Directors except at a regular or a special meeting, that the Clerk shall keep in a punctual, orderly, and reliable manner a record of the official acts of the Board, and that on all questions involving the expenditure of money, the yeas and nays shall be taken and entered on the records of the proceedings of the Board. The presumption of law is that public officers, including the Clerk of the Board, have done their duty and that their official required acts have been regularly performed, until the contrary appears: Leddy v. Board of Education School Dist. No. 99 (1911) 160 Ill. App. 187. There is no evidence here that the Clerk did not keep a record of the official acts

of the Board at the May 6th meeting when the plaintiff's employment was considered or that he did not take and enter the yeas and nays on the question of her employment on the records of the proceedings of the Board, and we cannot assume he did not perform his official required acts. On the contrary, the presumption of law is that he performed his duties. The burden of going forward with some proof to the contrary, if such was their view and position, was on the defendants.

██ ██ Furthermore, according to the Clerk, all he says is that *if* there were no actual minutes of the meeting of May 6, that is a mere ministerial or clerical omission by inadvertence. If that is what occurred, then the Clerk's record does not correctly state the facts, and such is a matter which is not chargeable to the plaintiff, and does not void an otherwise valid contract properly entered into as a matter of official business in fact transacted at a regularly held meeting. An inaccurate or incomplete Clerk's record cannot alter or control the fact of the official business actually transacted by the Directors at a regularly held meeting. The duties of the Clerk, as such, are purely clerical and ministerial and in subordination to the official action and direction of the Directors. The failure of the Clerk, if such occurred, to make a minute of the official business and action of the Board, there being no dispute as to what the action was, does not defeat the action of the Board or the plaintiff's cause of action; the statute does not make the record supposed to be kept by the Clerk the only evidence of the action of the Directors, —and unless the law expressly and imperatively requires all matters to appear of record and makes that record the only evidence thereof, which it does not here, parol proof is admissible to prove things omitted to be stated on the record; while official business can only be transacted at a regular or special meeting of the Directors, as was done here, it does not follow that

250

only the record kept or supposed to be kept by the Clerk can be used as evidence to prove that a contract was, in fact, properly entered into: School Directors v. Kimmel (1889) 31 Ill. App. 537; County of Vermilion v. Knight (1833) 1 Scam. 97; Ryan v. Dunlap et al. (1855) 17 Ill. 40; Bartlett et al. v. Freeport School Dist. Board of Education (1871) 59 Ill. 364; Jackson v. School Directors Dist. No. 85 (1924) 232 Ill. App. 102; Pollard v. School Dist. No. 9 (1895) 65 Ill. App. 104.

In Muehle v. School Dist. No. 38, County of Lake and State of Illinois (1951) 344 Ill. App. 365, one of the principal cases cited by the defendants on this, the teacher had been orally employed by another teacher-principal, there was no prior interview or official action of any kind by the Board of Directors, and there was no written contract. The case is vastly different on its facts from the case at bar and is not in point. In People v. Chicago & N. W. R. Co. (1947) 396 Ill. 466, the other case cited by the defendants, the adoption by a city council of an appropriation ordinance was held invalid on an objection by a taxpayer to certain city taxes because no yea-nay vote had been taken and recorded as required by statute, the Court saying that nothing short of a record showing a roll call with each individual's vote will constitute a yea-nay vote as required,—the council minutes there in evidence indicating on the adoption of the ordinance "Voting Aye 5. Nay—none. Carried." The present case, of course, does not involve a taxpayer's objection to some tax,—whether some additional considerations would be involved in a taxpayer's suit we need not now consider. Further, there is here no dispute but that at the May 6th official meeting each Director specifically and individually voted aye. There is no evidence the Clerk did not keep a proper statutory record thereof or that he did not take and enter the yeas and nays on the record. We can only presume and assume that he performed his official duties, there being no proof to the contrary.

We have read the record, as well as the abstract and briefs, and, although the evidence is to some extent somewhat conflicting, we believe the facts to be found therefrom are generally fairly set forth in the carefully prepared written opinion or statement of reasons for decision of the Trial Court, which opinion or statement is, unfortunately, not abstracted by either the plaintiff or defendants and can be found only by reference to the record itself. The facts, as substantially found therein, in addition to those set forth above, are:

During the time of the plaintiff's employment two other teachers, Mrs. McMurry and Mrs. Perino, were also engaged in teaching at the school,—all three being new teachers at that particular school,—there being some 76 pupils,—Mrs. Compton, the plaintiff, having been a qualified teacher since at least 1933 and for considerably longer than the other two teachers,—and there being no principal at the outset. On September 24, less than a month after her teaching at this school began, the plaintiff was appointed acting principal, the other two teachers evidently not wanting that position and the plaintiff's greater experience apparently better qualifying her; in fact, at that time, Mrs. McMurry was not a qualified teacher and had not previously taught school anywhere. The other two teachers then promptly informed two of the Directors of their intention to resign if the Directors permitted the plaintiff to continue as acting principal, notwithstanding they were not themselves apparently desirous of or qualified for the position. On September 25, the Directors rescinded the appointment of the plaintiff as acting principal, after one day, and on September 28, they promulgated certain written "Requirements for Teachers." On October 1, 1953, the Directors employed one Edward Keefe as administrator, with apparently the same duties as a principal. He was not then a qualified teacher, had never been at this school before, and had had no experience as a teacher or principal at any

other school, and did not become a qualified teacher until January, 1954.

After he came, October 1, and previous to about November 4, Mr. Keefe, who evidently also taught at the school, had erased the blackboard in the plaintiff's room whenever he had taught a class there before her; on that day, about November 4, the plaintiff asked him to erase the blackboard and type her examinations, and Mr. Keefe replied that he was not a secretary or a janitor; this statement provoked the plaintiff, and the plaintiff called Mr. Keefe "pig-headed."

Between 4:00 and 5:00 o'clock p. m., November 5, the next day, the plaintiff, Mr. Keefe, and Directors Schwarz and DeHaan met at the school, at Mr. Keefe's request. Mr. Keefe had written a letter to the Board in which he quoted Section 36, Art. VI, of the School Code (Ch. 122 Ill. Rev. Stats., 1953, par. 6—36 [Jones Ill. Stats. Ann. 123.810]), and he proposed that the plaintiff be dismissed "for insubordination and incompetency." Mr. Keefe had also prepared a form of resignation to be signed by the plaintiff. The letter and resignation form were submitted to the plaintiff and Mr. Keefe told her that "she was through." She was surprised, and indicated she thought she was doing a good job of teaching and would do her best to do whatever Mr. Keefe wanted. Mr. Keefe urged her to sign the resignation and he suggested that she would be better able to secure other employment if she resigned, which she declined to do.

A Mrs. Bennett called a meeting of the parents of the pupils for the evening of November 5. Mrs. McMurry and Director Schwarz testified that they attended the meeting and the plaintiff again called Mr. Keefe "pig-headed" and said she'd not take orders from Mr. Keefe, —which the plaintiff categorically denied saying. The plaintiff testified she said there that Mr. Keefe had treated her disrespectfully and that she had been a good teacher. Mr. Keefe was asked to state the reasons

for the plaintiff's dismissal, replied that he was not obligated to state any reasons, did not recall whether he actually gave any reasons, and evidently did not there state any reasons other than, perhaps, at best, the general charges of incompetency and insubordination. On November 6, formal notice of the defendants' termination of the contract was signed by all the Directors and taken to the plaintiff in her classroom while she was teaching. She did not thereafter teach at that school. At this point it may be observed that there is no evidence of any pupil or parent complaints against, or dissatisfaction with, the plaintiff.

It appears from the evidence that the plaintiff's appointment as acting principal, which lasted only one day, was rescinded, primarily, if not solely, because the other two teachers had thereupon promptly threatened to resign; however, Director Schwarz says that this rescission action was taken because the plaintiff took too much authority. In elaboration of that thesis, there is evidence that on September 25, when she was acting principal, she told Mrs. McMurry, who had answered a call, not to answer the telephone thereafter and that she, the plaintiff, would answer the phone because it was located just outside the door of the plaintiff's classroom. At that time Mrs. McMurry's entire teaching experience totalled a little over 20 days. Mrs. McMurry promptly telephoned Director Schwarz to come to the schoolhouse and settle the "telephone argument."

Prior to September 25, when there was no principal at all,—a condition of lack of administrative leadership or coordination for which the plaintiff was not responsible,—Mrs. McMurry says the plaintiff once called her down in a loud voice because Mrs. McMurry had called one of the Directors to locate a janitor to stop a leak in a toilet that was flooding one of the rooms, Mrs. Compton suggesting they need not call the Directors over something she could take care of herself. On an-

254

other occasion, Mrs. McMurry says a telephone call came for her, Mrs. Compton told the caller Mrs. McMurry could not be called to the phone, a number was left, but the information was never relayed to Mrs. McMurry,—the plaintiff has no recollection of that incident.

After Mr. Keefe came, October 1, Mrs. Compton had about three conversations with him about his being administrator and she probably "blew up" on one or more occasions; he and Mrs. McMurry say the plaintiff would not take orders from him and that she told him he was to stay out of her room, which is denied by the plaintiff; Mr. Keefe's desk calendar indicates his notations that on October 19, Mrs. Compton refused to take orders (what the "orders" were is not there shown or testified to) and had outbursts of temper, and that on November 2, she denounced the primary teacher.

Mr. Keefe says he had several conversations with the plaintiff concerning his right to supervise her work,—the matter of his executive authority seemed to weigh heavily with him,—and as to which there was and is no real controversy, but Mr. Keefe was remarkably vague in trying to point out specific instances of the plaintiff's alleged refusal to follow his proper instructions. The first, and about the only, instance he specifically mentions is the "pig-headed" incident of about November 4, which, if we understand it correctly, is really not an incident of his giving some proper order and the plaintiff wilfully disobeying it, but rather of the plaintiff's, rightly or wrongly, asking him to do something and his, rightly or wrongly, declining, and the plaintiff then becoming momentarily upset. He says he does not remember any other specific instance of her refusing to take instructions from him.

The defendants say the plaintiff had theretofore been accustomed to teaching in only one room schools, was not accustomed and adjusted to teaching

255

in a multiroom school and getting along with other teachers, and that her incompetency is evident by her inability to be harmonious with the other teachers. The defendants cite no authority to that effect and we think such is not the test of "incompetency" of a teacher, even assuming the plaintiff was the sole cause of any lack of harmony beyond that, such lack of harmony as may have existed at this school cannot, on this record, properly be laid entirely at the plaintiff's door, but was rather obviously the fault of all concerned, including the plaintiff, Mr. Keefe, the other two teachers, and the Directors.

Neither at their meetings November 5 or November 6, or at any other specific time, did the Directors themselves specificate or endeavor to specificate particular reasons or grounds for Mr. Keefe's general charges of incompetency and insubordination. The President of the Board, in fact, said they thought she was doing a decent job of teaching, but that she had refused to take orders from Mr. Keefe (specifically what orders the President did not say), and the President said he did not himself make any charges against Mrs. Compton nor did the other Directors. Although no formal specification of particular reasons or grounds, or a hearing thereon, is necessarily required in this case, if legal grounds for dismissal in fact existed, the fact that there was no specification or hearing tends to weaken the views of the defendants as to the supposed existence of particular grounds or reasons and is a circumstance properly to be considered by the trier of the facts in weighing the evidence and determining where the preponderance thereof lies.

■ ■ Under the statute (Ch. 122 Ill. Rev. Stats. 1953, par. 6—36) the defendant Directors had authority to dismiss the plaintiff teacher "for incompetency, cruelty, negligence, immorality, or other sufficient cause." Under another statute giving a Board of Edu-

cation even broader authority as to dismissals, it has been held the Board has the power of removal and dismissal for cause only and that the statute was not intended to bestow upon the Board power to arbitrarily or without cause dismiss teachers from their employment: Hartmann v. Board of Education, Westville Tp. High School Dist. No. 220 (1934) 356 Ill. 577. Under the statute applicable here, if the defendant Directors rely upon one or more of the statutory grounds for dismissal they must be prepared to show in defense of a suit of this character that grounds in fact exist,—the burden of proof is on them on that issue: School Directors v. Ewington (1887) 26 Ill. App. 379. "Incompetency," or any of the other statutory grounds, are questions of fact to be found or not found by the jury, or the Court sitting without a jury, from all the evidence when the matter gets into a suit, as here; one or more of the grounds must in fact so exist and be so found by the trier of the facts; a plaintiff teacher is not barred simply because the Directors thought her incompetent (if they did): Ewing v. School Directors Dist. No. 3 (1877) 2 Ill. App. 458.

▮ The plaintiff was hired under her contract to "teach, govern and conduct the common school of said district to the best of her ability." The plaintiff, under the power delegated to her as acting principal for but one day, did not abuse her authority with regard to the telephone matter. It appears, in fact, that the Directors put the identical rule with respect to the telephone, as the plaintiff sought to enforce, into effect by their own written requirements served on her September 28. For the plaintiff to pursue a policy as acting principal on September 25th, as to the telephone, which is the same as the Directors officially adopted September 28th, can hardly be said to be an abuse of authority.

▮ The plaintiff's refusal on occasion to comply, if she did, with the provision of the Directors' "Re-

quirements for Teachers" of September 28th, to supervise the playground,—which is apparently another cause of complaint,—could not be considered of sufficient importance to denote insubordination when her teaching contract, as well as the statute (Ch. 122 Ill. Rev. Stats., 1953, par. 23—1 [Jones Ill. Stats. Ann. 123.1118]), required the plaintiff, inter alia, "to see that the school house, grounds, furniture, apparatus—is not unnecessarily damaged or destroyed," which would necessarily require her presence in the building at times, and also when it is not disputed that much of the time after October 1 Mr. Keefe locked the doors of the schoolhouse anyway during the noon hour, provided and evidently expected no playground supervision whatever, and held teacher conferences with the plaintiff and the others in his office at that time, and also when there is evidence the plaintiff did, in fact, reasonably cooperate in the playground supervision, consistent with her other duties under the contract, and consistent with complying with Mr. Keefe's administrative requirement of noon hour teacher conferences.

The Directors' Requirements, as to the playground were, so far as material, "Each teacher, as stated in her contract, is responsible for her class on the playground. (1) It is not necessary to spend all recess and noon hour periods on playground, but give it enough attention that your own class is not destructive to any equipment, and that there is no fighting among the children." Though there is some conflict in the evidence as to the plaintiff's statement of her intentions in that regard, one of the Directors saying the plaintiff told him she would not supervise outside play, and Mrs. Compton denying she said that and testifying she said she would supervise on the playground when at least one other teacher was in the building, evidently she, in fact, did so supervise each day until Mr. Keefe started his noon hour meetings, which she had to attend. As a matter of fact, Mr. Keefe, who, presumably, knew more of the

plaintiff's day to day activities than the Directors, says he does not recall having any conversation himself with the plaintiff with reference to the playground, which seems strange if the plaintiff had been regularly and wilfully disobeying some requirement of the Directors, and he does not deny that the plaintiff did, in fact, so supervise each day until the noon conferences started.

The so-called minutes of the special meeting of the Board held on November 5, 1953 were actually in Mr. Keefe's handwriting, and were not kept by the Clerk, who was not even present at the meeting; although no minutes were recorded at the time and no one took notes of the proceedings at the time, Mr. Keefe wrote the minutes sometime in 1954, evidently from his recollection, and evidently after this suit was filed. The minutes are largely a summary of Mr. Keefe's personal reasons why the plaintiff should have been dismissed, and some of Mr. Keefe's miscellaneous views pertaining to the law relating to contracts, sufficiency of evidence, and allegiance to the flag. The minutes show that the plaintiff was dismissed on November 5th. On the other hand, Mr. Keefe and Director Schwarz both testified that on November 5th she had not been dismissed and that her discharge was not officially effected until November 6, and the defendants' brief on this appeal is to the effect the contract was terminated November 6 by Board action. Mr. Keefe's version, as shown by the minutes he wrote, might superficially indicate that the plaintiff was insubordinate when she ignored the authority of the Board and returned to her classroom and resumed the duties of a teacher on November 6th, but that would not be true at all if, as the other evidence indicates, she was not, in fact, officially discharged until November 6th. Under the circumstances, considering when, by whom, and the circumstances under which they were written, and their contents, no particular importance can be attached to the vague, generalized comments in those minutes,

259

some of which is obviously inaccurate, much of which is irrelevant, and very little of which indicates any official action by the Directors themselves.

There is no charge or complaint against the plaintiff of "cruelty," "negligence," or "immorality" under the statute, and no evidence whatever thereof. The charge of "incompetency" is simply not sustained by the evidence and the defendants have not satisfied the burden of proof on them in that respect,—there is no evidence of her lacking any technical, professional ability for the position for which she was employed, or of her not carrying out any statutory duties imposed on her, such as caring for the property of the District, or of her inability to maintain proper order and discipline among her pupils. Assuming that the charge of "insubordination," though not expressly stated as such in the statute, comes within "other sufficient cause" under the statute, that also is simply not sustained by the evidence and the defendants have not satisfied the burden of proof on them in that respect. About all that can be said is that there were clashes of personalities and momentary emotional outbursts here. But statutory legal grounds for dismissal of the plaintiff teacher and evidence to support such are notably absent.

In Muehle v. School Dist. No. 38, County of Lake and State of Illinois (1951) 344 Ill. App. 365, the defendants' principal authority on this, there was evidence the teacher refused to permit small children to go to the toilet except at specified periods, soiled clothing resulted, she humiliated children in class by questions as to where their money was for contributions, she forced a pupil to write with his right rather than his natural left hand, and she made disparaging remarks to pupils regarding their parents. The facts are so different from the case at bar that it is not helpful here. And even if we adopted the view indicated in that case that under the statute authorizing dismissal for "other sufficient cause" the Board of Directors has a discretion

trammelled only by proof of that discretion's abuse, there was, in the case at bar, an abuse of discretion by the Board.

■ There is some evidence that only two vacancies existed at schools in the general vicinity,—Rock Falls and near Morrison (the latter not beginning until the second semester),—after the plaintiff was discharged, which she might possibly have taken advantage of in mitigation of damages. She did, in fact, do some substitute work after January 1, 1954. The Superintendent of Schools testified that he never informed plaintiff of those vacancies, and he declined to give her a recommendation. She had some doubt whether she was eligible for one of them; she found the vacancy at Rock Falls filled when she inquired, and she made no inquiry at the other place. We think, under the circumstances, she did all that might reasonably be expected by way of mitigation of damages. There is no evidence she was qualified for any other type of work except teaching. There is no evidence any other possible employment was open and available to her except as heretofore stated. The County Superintendent of Schools says no other schools approached him during the school year about Mrs. Compton as a teacher. She was not necessarily required immediately after her discharge, November 6, 1953, to rush out and try to find some other comparable or other position; such is not so easy at that particular time of year in the teaching profession; it is not established that in the first couple of months following her discharge she could have obtained, reasonably, a position for which she was qualified; and she can hardly be reasonably criticized for holding herself available for a time and not risking a possible charge of breach on her part, should the Directors have seen fit to rescind their termination and try to avoid their breach, in view particularly of the Directors' previous somewhat vacillating procedure as to the plaintiff.

261

The plaintiff having proved, by the preponderance of the evidence, a contract of employment for a definate time and stipulated salary, that she was prevented from fulfilling it by act of the defendants, and that she was ready, willing, and able to complete it, she is entitled, prima facie, to recover the entire sum, or unpaid balance thereof, contracted to be paid; although she was obliged to mitigate the damages, and although any sums which she, in fact, earned or which might reasonably have been earned by the exercise of reasonable diligence under her particular circumstances should be deducted from the damages otherwise due, the burden of proof as to mitigation of damages is on the defendants; and they have not shown she, in fact, earned or could by reasonable diligence have earned more than she, in fact, did, which actual earnings have already been properly credited herein in mitigation: School Directors v. Crews (1887) 23 Ill. App. 367; Brown v. Board of Education (1889) 29 Ill. App. 572; McPherson v. Board of Education Waukegan Tp. High School Dist. (1925) 235 Ill. App. 426; Doyle v. School Directors (1889) 36 Ill. App. 653; Fisher v. Massillon Iron & Steel Co. (1918) 209 Ill. App. 616; Wilson v. Board of Education of School Dist. No. 126 Union (1945) 327 Ill. App. 338.

The witnesses for the plaintiff were the plaintiff herself, and, under Section 60 of the Civil Practice Act [Ill. Rev. Stats. 1953, Ch. 110, § 184; Jones Ill. Stats. Ann. 104.060], Mr. Schwarz, Mr. Myers, and Mr. DeHaan, the Directors. The witnesses for the defendants were the plaintiff, under Section 60, all the Directors, Mr. Keefe, Mrs. Mott, treasurer of the district, Mrs. McMurry, and Mr. Young, the County Superintendent of Schools. The report of proceedings, including their testimony and the various exhibits, occupies some 145 pages of the record. The cause having been heard by the Court without a jury the findings of the Trial Court on questions

of fact are entitled to the same weight as those of a jury's verdict, and in reviewing the judgment, so far as the Court's determination of questions of fact are concerned, we are to be guided by the same principles as would be applied had there been a jury's verdict. It was, primarily, the Trial Court's function, as an original matter, to observe the witnesses' conduct and demeanor while testifying, as well as their testimony itself, to determine their credibility, interests, and motives, if any, so far as appeared, and to weigh the evidence and determine where the preponderance thereof lies. There is competent evidence which, standing alone, together with all reasonable inferences and intendments from it in its aspect most favorable to the plaintiff, fairly tends to prove the essential elements of the plaintiff's case. There is no complete absence of probative facts to support the conclusion reached. Hence, had there been a jury, a motion by the defendants for a directed verdict or for judgment notwithstanding the verdict could not have been allowed. Weighing the evidence, not to determine as an original matter its preponderance, which was, primarily, the Trial Court's function, but only to determine whether the judgment is contrary to the manifest weight of the evidence, we do not believe the judgment is contrary to the manifest weight of the evidence. We may not set aside the judgment merely because in some respects the evidence is conflicting. Nor may we assume the function of the Trial Court and substitute our judgment, as an original matter, for its in passing on the weight and credibility of conflicting testimony. Hence, had there been a jury, a motion by the defendants for a new trial could not have been allowed.

The judgment will, therefore, be affirmed.

Affirmed.

DOVE, P. J. and EOVALDI, J., concur.