JOSEPH HALL *et al.*, Plaintiffs-Appellants, *v.* THE BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (4th Division)   No. 76-58

Opinion filed May 5, 1977.

Robert F. Ward and William Van Hagey, both of Chicago, for appellants Richard Lawrence and Nicholas Barnes.

Michael J. Murray, of Chicago, for appellee Board of Education of the City of Chicago.

William R. Quinlan, Corporation Counsel, of Chicago (Robert Retke, Assistant Corporation Counsel, of counsel), for appellee City of Chicago.

Mr. PRESIDING JUSTICE DIERINGER delivered the opinion of the court:

This action was brought in the circuit court of Cook County by plaintiffs who are Chicago residents, taxpayers and parents of children in the Chicago public schools against the Board of Education of the City of Chicago (Board) and the City of Chicago (City). They sought injunctive and other equitable relief requiring the Board of Education as trustee for the benefit of schools (1) to determine the rental which should have been received by it from the City of Chicago for the Midway Airport land for each of the years 1969 through 1974, under the terms of the lease requiring that such rental be calculated at 6 percent of the true cash value of the land as determined by appraisal; (2) to account for said rentals; and (3) to require the City to pay rent calculated as set forth under the terms of the lease for the period January 1, 1975, to December 31, 1980. After a bench trial, the court found the plaintiffs had failed to sustain their burden of proof and entered judgment for defendants.

The issues for review are (1) whether the Board of Education failed to discharge its duty as trustee to exercise judgment and care in the administration of the Midway Airport property; (2) whether the Board of Education failed to discharge its duty as trustee to act with undivided loyalty with respect to the Midway Airport property; and (3) whether the trial court erred in admitting certain evidence offered by the defendants respecting the valuation of the Midway property.

The Board is the owner in trust of the parcel of property known as Midway Airport which is bounded by Cicero Avenue, 63rd Street, Central Avenue and 55th Street on the southwest side of the City of Chicago. The property is almost one mile square and consists of approximately 600 acres. It is "section 16" land within the meaning of section 15—1 of the School Code. Ill. Rev. Stat. 1973, ch. 122, par. 15—1.

In 1931, the Board entered into a written lease agreement with the City under which the Board leased the subject property to the City for use as an airport. The lease extends to December 31, 1980, and rent was to be computed as follows: For the first 20 years (1931-1950), the annual rent due was a graduated flat rate per acre plus 10 per cent of the City's gross annual receipts from the operation of the airport, and for the remaining period after January 1, 1951, the lease required that an appraisal of the property be conducted every 10 years to determine "the true cash value of the said demised land at the time of such appraisement exclusive of the improvements thereon and not taking into consideration any encumbrances, liens, clouds or charges of whatsoever kind standing against the premises." The rental for each year was to be computed at 6 percent of the appraised valuation.

The lease was modified through supplemental agreements executed in

1938, 1964 and 1970. Under the 1970 supplemental agreement the appraisement of the property for the purposes of fixing the annual rent was deferred for five years until the three month period preceding January 1, 1975, and the amount of rent to be paid during that period of time was $24,560.67 plus 10 percent of the gross annual receipts derived by the City from the demised premises.

The lease also provided that at the termination date all improvements become the property of the Board. At the time of trial the airport improvements consisted of a main terminal building, 15 hangar-type buildings, and underground fuel tanks with a capacity of 550,000 gallons. The property is covered with eight major runways 175 feet wide, and the 360,000 lineal feet of runways are constructed of concrete and asphalt to a depth of 36 to 40 inches.

The property was originally bisected by a 17-acre railroad right-of-way, but in 1938 the City arranged to have it relocated, and the property was conveyed in trust for the use of the schools without cost to the Board.

Rentals based on a fixed amount plus 10 percent the gross annual receipts increased from $16,000 in 1931 to $233,000 in 1958. Rentals then decreased to a low of less than $54,000 in 1965. The approximate rentals for the years 1967 to 1973 were as follows:

| | |
|---|---|
| 1967 | $ 68,000 |
| 1968 | $142,500 |
| 1969 | $193,000 |
| 1970 | $232,500 |
| 1971 | $243,000 |
| 1972 | $245,000 |
| 1973 | $231,000 |

The plaintiffs first contend the Board breached its fiduciary obligation as trustee by failing to adequately investigate the value of the Midway land and by failing to act with an undivided loyalty with respect to the trust. In support of their arguments the plaintiffs point out that on January 29, 1969, Joseph McMahon, who was in charge of the division of real estate of the Board, wrote a letter to Frank M. Whiston, then president of the Board, informing him that an appraisal to determine a new rental for the remainder of the lease should be commenced, but he also stated:

"It is almost certain that with more than 26,000,000 square feet of land involved that an appraisal would send the rental beyond what the City would feel it could pay."

A report of the real estate committee which was adopted by the Board on August 26, 1970, stated the City had requested that the appraisal for the purpose of establishing rental be deferred for a five year period so that the "revitalization and stabilization of Midway could be achieved."

The Board voted nine to one to adopt the resolution and in opposing the action Dr. Bernard Friedman stated the full value of the Midway Airport property would be between 20 and 40 million dollars, an informal estimate provided by Mr. McMahon. Friedman argued the Board had the obligation solely to the school system and not to the airport.

The plaintiffs argue that achieving economic stability for Midway Airport was not a goal which the Board could legally pursue given its duty to administer trust property solely for the benefit of the schools. They rely on the cases of *City of Chicago v. Tribune Co.* (1910), 248 Ill. 242; *Lassen v. Arizona ex rel. Arizona Highway Department* (1967), 385 U.S. 458, 17 L. Ed. 2d 515, 87 S. Ct. 584, and *United States v. 78.61 Acres of Land* (D. Neb. 1967), 265 F.Supp. 564, in which the courts held that land held in trust for specific charitable purposes must be used exclusively for the trust beneficiaries, and may not be used for the general public good. They cite the language of *Prescott Community Hospital Com. v. Prescott School District No. 1* (1941), 57 Ariz. 492, 494, 115 P.2d 60, 161, in which the court stated:

> "School districts are created by the State for the sole purpose of promoting the education of the youth of the State. All their powers are given them in trust for the same purpose, and any contract of any nature which they may enter into, which shows on its face that it is not meant for the educational advancement of the youth of the district but for some other purpose, no matter how worthy in its nature, is *ultra vires* and void."

The plaintiffs contend that the Board has the burden of proving its good faith dealing by clear and convincing evidence, because the lease of the property to the City, another instrumentality of the State, constituted self-dealing. However, the plaintiffs cite no cases for the unique proposition that the City is the Board's alter ego, and we do not deem it to be persuasive. In *City of Chicago v. Tribune Co.* (1910), 248 Ill. 242, 250-51, cited by the plaintiffs, the court held that waiver of a revaluation clause and adherence to an alternative rental index did not constitute a wrong *per se* which would cast the burden of affirmatively demonstrating the propriety of the action upon the defendants. Article VII, section 10 of the 1970 Constitution of Illinois is also relevant. It provides in part as follows:

> "(a) Units of local government and school districts may contract or otherwise associate among themselves, with the State, with other states and their units of local government and school districts, and with the United States to obtain or share services and to exercise, combine, or transfer any power or function, in any manner not prohibited by law or by ordinance. * * *

* * *

(c) The State shall encourage intergovernmental cooperation and use its technical and financial resources to assist intergovernmental activities."

Although it is clear that the Board cooperated with the City in its goal to revitalize Midway and postponed immediate profits by postponing the revaluation appraisal, the record shows it did so in the hope of obtaining greater future benefits. The termination of the Midway lease on December 31, 1980, is not a remote prospect, and the efforts of the City to revitalize the airport and the tripling of the rent which resulted was of direct benefit to the public school system. Putting the property to an alternative use would require the installation of basic services such as water, power, sewers and streets, and there was testimony that it would take at least five years to redevelop the property. It is clear that the Board would be in a better position if Midway were a profitable going concern when it becomes the sole property of the Board in 1980, than if it were allowed to deteriorate and become a totally uneconomic burden for the next several years.

It is clear that cooperating with the City in the revitalization efforts by postponing the revaluation was not in conflict with the best interests of the Board. In the case of *Sebree v. Board of Education* (1912), 254 Ill. 438, 460, the court stated:

"The evidence, we think, shows clearly that a ten-year re-valuation clause in a long-term lease would not be beneficial to the lessee. It seems to be assumed by counsel for both parties that even though not advantageous to the lessee it would be to the owner. Provisions in a lease, especially on property similar to that here involved, that would be ruinous to the lessee, in the long run might not be advantageous to the owner of the land, for if the lessee became bankrupt by the onerous provisions in the lease the lessor would not be able to collect his rents, and would thereby be compelled to make a new lease on terms fair to both parties or put the land to some other use."

■■ In this case, the evidence established that the postponement of the revaluation was a business decision of a discretionary nature, and that the decision was made after careful deliberations taking all available facts into consideration.

In July of 1971, the Real Estate Research Corporation submitted a study of Board property to the Board. The report concluded that the Midway property should be continued as an airport until a third major airport was built. In March of 1972, a subsequent report indicated that the Midway lease was a restriction on the future disposition of the property, and its use and future marketability were effectively constrained; therefore, the existing use, structures and lease probably precluded a

different use in the immediate future. There was no disposition recommendation, and no value was indicated for the property. The report concluded that a revaluation would benefit the Board, but it was possible that by reason of the "percentage of gross" provision in the lease the Board would receive more revenue than it had been receiving if revenues increased as expected.

Joseph McMahon testified that in August of 1969, he sent Frank Whiston, who was then president of the Board, information regarding the lease including a historical sketch, an outline of the lease, and rentals paid in the previous several years. He said the members of the real estate committee were given pertinent information with respect to the lease prior to the committee meetings and were presented with information in the years 1967 through 1970 with respect to the rentals that had been received from the City.

He testified that the Midway lease was discussed by the committee at the meeting on August 24, 1970, and at that meeting he explained the three-fold increase in rent between 1967 and 1969 to the committee members. At the same time he pointed out data showing that the percentage rentals had increased simultaneously with the City's attempt to revitalize the airport. The supplementary lease continuing the percentage of gross rental was approved by the committee, and a report to the full Board was prepared for consideration at its next regular meeting on August 26, 1970.

It should be noted the report was approved by the Board even though Dr. Friedman made the same arguments in opposing it as the plaintiffs make now. Among the Board members voting to continue the "percentage of gross" rental was the president of the Board, Frank Whiston, who was considered to be one of the most knowledgeable people in the Chicago area with respect to all phases of real estate.

Gerald Sbarbaro, chairman of the real estate committee since 1970, testified the members of the Board, with the exception of Frank Whiston, had no expertise to put a value on real estate, and the Board looked to the Real Estate Research Corporation to provide them with guidance with regard to their real estate holdings, and only on the rarest occasion would the Board not follow its recommendations. Neither the Real Estate Research Corporation report nor the other reports he read contained any opinion of the value of Midway Airport.

He further testified the committee on real estate met on November 21, 1974, and discussed the Midway lease. The committee considered that a recent study of the needs of Midway made by the Federal Aviation Administration was important to any determinations made by the Board. As a result the president of the Board was directed to meet with the Chairman of the Public Works and Transportation Committee of the

United States House of Representatives, his congressional committee, and appropriate Federal officials to determine what they had in mind for the future of Midway Airport.

The record also shows the City cooperated with the Board on many matters resulting in very substantial financial benefits to the Board. In its answer to the second amended complaint and in answer to plaintiffs' interrogatories, the Board stated that many local benefits are exchanged between the two local governmental bodies which provide for a mutually beneficial and efficiently operating relationship. Among the benefits received and weighed by the Board were the addition of the railroad right-of-way to the parcel; the capital improvements made since 1931, and in particular the more than 15 million dollars of City, State and Federal funds with which the City upgraded the airport between 1968 and 1970; receiving $8,000,000 from the City's receipts from the 1969 income tax fund; receiving $1,200,000 to carry out necessary school programs; the payment of the Board's share of the pension contributions at an annual cost of about $11,000,000; the vacation and conveyance to the Board of streets and alleys in order to make school lands contiguous; the furnishing of water without charge to all school buildings and other facilities; trash removal; rodent and pest control in school buildings without charge; and the enhancement in valuation of real estate in general, causing increased real estate tax receipts to the Board through the efforts of the City to develop Midway Airport.

The plaintiffs next argue the Board improperly acquiesced in the City's request to defer an appraisal of the land, knowing that the resulting rental would be lower than the rental which could be derived from 6 percent of the appraised value. They contend the Board had notice that the value of the parcel was as much as $40,000,000, which they base on McMahon's informal estimate and other facts and inferences which we deem not to be persuasive.

However, at trial, Wayne L. Mahnke, the plaintiffs' appraisal witness, testified that in his opinion the minimum value of the land was $15,000,000, but in arriving at that figure he did not take into consideration the cost of removing the runways and other airport improvements. He stated the highest and best use was for an industrial complex, although it could be used for anything from a municipal sports complex to a shopping center.

Both of the defendants' valuation experts, John Lydon and John McNamara, testified they could not determine the "true cash value" of the property because of the special use zoning; however, when asked to form an opinion of the value of the airport without regard to the present zoning, McNamara indicated the highest and best use would be for

single-family R-2 development, and the value of the property would be almost $4,000,000. In arriving at that figure he did take into consideration the removal of the runways and other facilities which he said would cost about $5,500,000. He stated that an industrial or commercial use would not produce a higher return on the property because of the numerous industrial tracts in the area.

Thus, the court was presented with a factual dispute with respect to the highest and best use of the property and with respect to the resulting valuation appraisals, and the court apparently resolved the dispute in favor of the defendants.

The plaintiffs finally contend the court erred by allowing evidence of the special use theory of value, because the language of the lease which specified that the property was to be appraised "exclusive of the improvements thereon, and not taking into consideration any encumbrances, liens, clouds or changes of whatever kind" eliminated the need to consider the present airport zoning.

The plaintiffs also contend that the testimony of Howard Diemler, an airport consultant, should have been excluded. He testified that the percentage of value method of determining the rent was "just not a practical solution" and that the method created problems in terms of the "ability of the City to pay the rental." They argue his testimony was irrelevant to the issues of valuation or whether the trustee failed to discharge its fiduciary obligations.

■■ A review of the record fails to indicate that the evidence objected to played a crucial role in the determination of the outcome of the litigation. Both of the defendants' appraisal witnesses first testified they could not determine the "true cash value" of the property because of the special use zoning, but John McNamara did indicate his opinion of the value of the property exclusive of zoning considerations and thus, he presented evidence independent of the special use theory upon which the court could base its decision.

The law is well established that a court will not interfere with the exercise of legislative powers or substitute its judgment unless the action of the Board is palpably arbitrary, unreasonable or capricious; or unless fraud, corruption, oppression or gross injustice is shown. *Richards v. Board of Education* (1960), 21 Ill. 2d 104, 110; *Bongi Cartage, Inc. v. City of Chicago* (1961), 33 Ill. App. 2d 433; *Compton v. School Directors* (1955), 8 Ill. App. 2d 243, 249-50; *Crofts v. Board of Education* (1969), 105 Ill. App. 2d 139, 148-49.

■■ In this case, the Board had legislative authority to enter into the lease (Ill. Rev. Stat. 1969, ch. 122, par. 34—21), and the record shows it acted in good faith after considering the lease with a view toward

maximizing long range benefits and with knowledge of the mutually beneficial pattern of cooperation which exists with the City. In *Giddens v. Board of Education* (1947), 398 Ill. 157, 169, the court stated:

"The questions thus raised by plaintiffs are primarily factual in character and, having been decided adversely to them by the chancellor, in the first instance, and by the Appellate Court upon review, the decrees refusing to set aside the appraisement cannot be reversed, unless contrary to the manifest weight of the evidence."

There have been no allegations of fraud or corruption in this case, and after thoroughly reviewing the extensive record, we conclude the judgment was not contrary to the manifest weight of the evidence.

For these reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.