KATHLEEN GREER *et al.*, Plaintiffs-Appellants, v. THE ILLINOIS HOUSING DEVELOPMENT AUTHORITY, Defendants-Appellees.

First District (4th Division) No. 85—930

Opinion filed November 6, 1986.—Rehearing denied January 6, 1987.

362

JIGANTI, J., dissenting.

Michael L. Shakman, Geraldine Soat Brown, and Barry A. Miller, all of Miller, Shakman, Nathan & Hamilton, of Chicago (Mary Pennington Anderson, of counsel), for appellants.

James C. Murray, Jr., Patrick J. Lamb, and Rachel F. Best, all of Katten, Muchin, Zavis, Pearl & Galler, of Chicago, for appellees Elzie Higginbottom, Alfred Davis, Kenwood Apartments, and American National Bank

& Trust Company of Chicago.

Richard T. Franch and Michael Palmer, both of Jenner & Block, of Chicago (John E. Glennon, of counsel), for appellee Illinois Housing Development Authority.

JUSTICE McMORROW delivered the opinion of the court:

Plaintiffs, residents of the Kenwood neighborhood in the city of Chicago (the neighbors), brought suit against the Illinois Housing Development Authority (IHDA) and the owners (the developers) of a proposed rehabilitation development project in Kenwood (the proposed development) for which IHDA approved assisted mortgage financing. The trial court entered judgment on the pleadings in favor of IHDA with respect to the neighbors challenge of IHDA's agreement to fund the proposed development. The trial court found that the Chicago zoning ordinance did not preclude the type of rehabilitation planned by the developers, and dismissed, for failure to state a claim, the neighbors' action against the developers with regard to an alleged zoning violation. Following an evidentiary hearing, the trial court entered judgment for the developers on the premise that the development would not violate the Chicago building code or the Chicago rehabilitation code. The neighbors appeal.

There are essentially five questions presented for our review: (1) whether the actions of IHDA at issue here are placed beyond the scope of judicial review by virtue of certain language of the Illinois Housing Development Act (the IHDA Act) (Ill. Rev. Stat. 1985, ch. 67½, par. 301 et seq.); (2) whether the neighbors have standing to seek judicial review of IHDA's approval of assisted mortgage financing for the proposed development; (3) whether the parties' pleadings established as a matter of law that IHDA's decision to provide assisted mortgage financing for the development was proper in that IHDA had no "statutory obligation of economic integration" with respect to the proposed development and in that IHDA reached its decision to provide financing based upon its own independent consideration of all pertinent factors in light of its having no "statutory obligation of economic integration"; (4) whether the neighbor's complaint stated a claim that the development violated the Chicago zoning ordinance; and (5) whether evidence heard by the trial court established that the developers' rehabilitation of the proposed development would not violate the Chicago building and rehabilitation codes.

On appeal the court's resolution of these complex questions has been greatly facilitated by the cogency and thoroughness of thought

and analysis displayed by the learned trial court judge and the parties' able counsel. For the reasons set forth more fully below, we conclude that the IHDA Act does not place the actions of IHDA at issue here beyond the scope of judicial review and that the neighbors have standing to seek judicial review of IHDA's financing of the proposed development.

With regard to the neighbors' argument that the IHDA Act imposes upon IHDA a "statutory obligation of economic integration," we determine that judgment on the pleadings was erroneously entered. Our review of the record indicates that the neighbors' argument, IHDA's response, and, as a result, the trial court's determination, do not clearly distinguish between two possible conceptions of IHDA's alleged "statutory obligation of economic integration." IHDA's "statutory obligation" as alleged in the neighbors' complaint may be interpreted as either an obligation to actively promote economic integration or heterogeneity or an obligation to avoid economic segregation or homogeneity. In view of the fact that the parties' arguments and the trial court's order can be interpreted as having relied upon either, or both, of these conceptions of IHDA's alleged "statutory obligation of economic integration," we consider whether judgment on the pleadings in favor of IHDA was properly entered either on the basis that IHDA has no duty to actively promote economic integration or on the basis that IHDA has no duty to avoid economic homogeneity.

We conclude that IHDA has no statutory duty under the IHDA Act to affirmatively promote economic integration in the projects which it agrees to finance. Our review of the Act leads us to conclude that IHDA has, instead, a statutory obligation to refrain from promoting economic homogeneity in the developments for which it provides assisted mortgage financing. We further determine that the parties' pleadings dispute material facts and the reasonable inferences to be drawn therefrom regarding whether IHDA violated its statutory duty to refrain from promoting economic homogeneity among the tenant composition in the proposed development at issue here and whether IHDA failed to exercise its discretionary authority to finance projects that avoid economic homogeneity. As a result, we reverse the trial court's entry of judgment on the pleadings in favor of IHDA with regard to IHDA's "statutory obligation of economic integration" and remand the matter for further proceedings consistent with the nature of IHDA's statutory obligation as enunciated herein.

In addition, we determine that the neighbors' claim failed to state a cause of action that the rehabilitation of the proposed development

intended by the developers would constitute an "addition to or enlargement of" the developments' structures in alleged violation of the Chicago zoning ordinance. We therefore affirm the trial court's dismissal of the neighbors' claim against the developers with respect to an alleged Chicago zoning ordinance violation. We also find that the neighbors' evidence established that the proposed development violates certain provisions of the Chicago building code and the Chicago rehabilitation codes and reverse the cause in this regard and remand for further proceedings.

Plaintiffs are nine residents of the Kenwood neighborhood in the city of Chicago. The developers plan to rehabilitate structures located at 4710 South Woodlawn Avenue (the Woodlawn structure) and 4716-28 South Ellis Avenue (the Ellis structures) in the Kenwood neighborhood. The developers intend to construct a total of 48 units of housing in the Woodlawn and Ellis structures.

Defendants are the legal and beneficial owners of the properties, as well as the beneficiaries of the land trust in which title to the property has been placed. IHDA has agreed to a loan commitment to the developers of approximately $2.3 million to rehabilitate the Woodlawn and Ellis structures.

The neighbors filed their initial complaint against IHDA and the developers on January 23, 1985. As ultimately amended, the complaint pleaded challenges to the actions of IHDA in counts I, IA, and IB: allegations that the proposed development violated the Chicago zoning ordinance in count II and part of count IV; and claims that certain aspects of the intended rehabilitation of the development were prohibited by the Chicago building code in count III and part of count IV. Because the trial court dismissed some of the counts on the pleadings and disposed of others following a hearing, each group will be considered separately.

I. CHALLENGES TO ACTIONS OF IHDA

BACKGROUND

The neighbors claims against IHDA sought declaratory relief and an order of common law *certiorari*. IHDA answered the allegations of the pertinent counts of the pleading as well as later amendments to these counts. The neighbors also sought injunctive and declaratory relief from IHDA in count IV of their complaint, alleging that IHDA's provision of assisted mortgage financing for the proposed development constituted an unlawful participation by IHDA in the developers' violations of the Chicago zoning ordinance and the Chicago

building and rehabilitation codes. Since the sufficiency or merit of the allegations against IHDA in count IV are not at issue between the parties on appeal, we do not consider their substance herein.

■ As a preliminary matter, we note that IHDA contends that its motion for judgment on the pleadings pursuant to section 2—615(e) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—615(e)) brought into question both the neighbors' complaint and IHDA's answer and exhibits thereto. The neighbors argue that IHDA's answer and attached exhibits are not the proper subject of consideration because the trial court ruled on IHDA's section 2—615(e) motion before the period for the neighbors' reply had expired. (See 87 Ill. 2d R. 182(a).) However, the neighbors never objected to the trial court's early ruling at the hearing on IHDA's section 2—615(e) motion. As a result we deem this argument waived on appeal (see *Spencer v. Community Hospital* (1980), 87 Ill. App. 3d 214, 217-18, 408 N.E.2d 981) and conclude that this court's review of the trial court's order properly includes consideration of the pleadings of both the neighbors and IHDA. See *Walker v. State Board of Elections* (1976), 65 Ill. 2d 543, 552-53, 359 N.E.2d 113; *Cunningham v. Mac-Neal Memorial Hospital* (1970), 47 Ill. 2d 443, 448, 266 N.E.2d 897; *Heritage Standard Bank & Trust Co. v. Trustees of Schools* (1980), 84 Ill. App. 3d 653, 659-60, 405 N.E.2d 1196; *Oak Park National Bank v. Peoples Gas Light & Coke Co.* (1964), 46 Ill. App. 2d 385, 393, 197 N.E.2d 73.

■ IHDA further argues that the neighbors' failure to reply to additional matter alleged in IHDA's answer constituted an admission by them of those matters. The record shows that the neighbors were granted leave to amend, and did amend, their complaint after IHDA filed its answer to the pleadings and that the allegations in the amended complaint responded to IHDA's answer. The record also indicates that IHDA's subsequent answer to the amendments consisted of admissions or denials that raised no additional significant matter. As a result we determine that the neighbors' amended complaint met and denied IHDA's answer and that the neighbors' failure to reply did not constitute an admission of the matters set up in IHDA's answers to the neighbors' complaint. See Ill. Rev. Stat. 1985, ch. 110, pars. 2—602, 6—610(b); *Nitrin, Inc. v. American Motorists Insurance Co.* (1968), 94 Ill. App. 2d 197, 207, 236 N.E.2d 737.

Based upon the foregoing, we set forth the pertinent facts surrounding IHDA's decision to provide assisted mortgage financing for the proposed development to the extent that these matters are not substantially in dispute between the parties. The controverted allega-

tions found in the neighbors' complaint and IHDA's answer follow thereafter. Background regarding Federal and Illinois housing assistance programs is provided where necessary to elucidate the relevance of certain factual matter appearing in the parties' pleadings.

IHDA is a statutorily created body politic and corporate. (Ill. Rev. Stat. 1985, ch. 67½, par. 304.) One of its functions is, in essence, to distribute, in housing assistance payment contracts (HAP contracts) with Illinois developers, the section 8 housing assistance funds which it has agreed to receive from the United States Department of Housing and Urban Development (HUD). (See Ill. Rev. Stat. 1985, ch. 67½, pars. 307.11, 310, 312; 42 U.S.C. sec. 1437f(a) (1985); 24 C.F.R. sec. 813.101 (1985).) IHDA's annual contributions contract with HUD, pursuant to which IHDA approved assisted mortgage financing for the proposed development, was dated January 27, 1984. IHDA's grant to the developers of approximately $2.3 million in financing was based upon IHDA's approval of the developers' proposed tenant selection plan. This tenant selection plan stated that "[a]t least 100% of the units will be made available to persons who qualify under the very low income level of Section 8 [42 U.S.C. sec. 1437f] for a given area."

The section 8 program is a housing assistance payment program administered by HUD. Section 8 assistance payments are designed "[f]or the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." (42 U.S.C. sec. 1437f(a) (1985).) Under the section 8 program, tenants pay no more than 30% of their income towards rent; HUD compensates the developer for the remaining balance needed to generate rentals which HUD has determined to be the "market rate" for the area. See 42 U.S.C. secs. 1437(a), 1437(c) (1985); 24 C.F.R. sec. 813.107 (1985).

Generally, section 8 funds may be used to subsidize housing for either low income families or very low income families, as those levels are defined in the Code. (See 42 U.S.C. secs. 1437a(b)(2), 1437f(c)(4), 1437n (1985); see also 24 C.F.R. secs. 813.101, 813.102, 813.105 (1985).) Although the Code originally required that at least 30% of section 8 funds be used for very low income assisted housing (see 42 U.S.C. sec. 1437f(c)(7) (repealed); 24 C.F.R. sec. 883.704(c)), the section 8 program was modified by Congress in 1981 to require that at least 95% of section 8 funds be allocated to very low income assisted housing. See Pub. L. No. 97—35, sec. 322 *et seq.*, 95 Stat. 354, 400 (Omnibus Budget Reconciliation Act of 1981); 42 U.S.C. sec. 1437n (1985); 24 C.F.R. sec. 813.105 (1985) (requiring 100% allocation to very low income assisted housing); see also *Martinez v. Rhode Island Housing & Mortgage Finance Corp.* (1st Cir. 1984), 738 F.2d 21.

In a letter dated February 18, 1983, to HUD, IHDA commented on HUD's (then proposed) regulations implementing the 1981 amendments. IHDA's letter objected to several of the proposals (now 24 C.F.R. secs. 813.013, 813.103 (1985)). As background to its specific remarks, IHDA's letter noted that "[o]ne of the cornerstones of [IHDA's] development activities has been promotion of the concept of mixed-income housing. *** Many of our developments have only 20% to 30% of all units subsidized. In addition, the Authority has promoted economic integration within the subsidized units by attempting to achieve a balance between low-income and very low-income tenants. *** Given the Authority's emphasis on mixed-income housing, the Housing and Community Development Amendments of 1981 and the proposed regulations will have a profound effect on the Authority's program activities."

The developers' request for funding from IHDA was submitted in November 1983 and specified that all of the units were intended for section 8 assistance. The developers' proposal as well as the responses thereto in the following referenced letters or memoranda of HUD, other State agencies or officials, and IHDA were exhibits incorporated by reference into IHDA's answer to the neighbors' complaint. Since the authenticity of the exhibits is not disputed, we accept their authenticity for the purposes of analysis upon review.

HUD recommended approval of the project in a memorandum which indicated that there was a need for the units, the development was consistent with the *Gautreaux* consent decree (which calls for scattered site/subsidized housing) (see *Gautreaux v. Pierce* (7th Cir. 1982), 690 F.2d 616) and the city of Chicago's housing assistance program, the proposed market-rate rents were compatible with the designated fair market rents for the area, and the proposed development would not cause an undue concentration of assisted housing in the area.

A report of the Northeastern Illinois Planning Commission (see Ill. Rev. Stat. 1985, ch. 85, par. 1101 *et seq.*), dated August 22, 1984, also advised funding of the proposed development. The report suggested waiver of section 8's guideline of only 20% assisted housing in the development (see 42 U.S.C. sec. 1437f(c)(4) (1985)) because the "[s]ite is small scale-scattered site proposal (49 units or less)" and because the "[p]roposal will replace substandard housing units in the area." The Commission's report enclosed letters from the department of planning and the department of housing of the office of the mayor of the city of Chicago, stating that the development had been reviewed and that these departments had no objection to its going for-

ward. Other public officials also suggested approval of the project.

IHDA approved the developers' proposed tenant selection plan on November 15, 1984. The plan specified that all of the units would be made available to rental by section 8 "very low income" families.

IHDA internal memoranda also advised financial assistance for the proposed development. One memorandum, dated December 21, 1984, concluded that the "48 units proposed for Kenwood Apartments would have a negligible impact on the community ***." Another internal memorandum, dated January 18,1985, determined that the development was not feasible for market-rate rental because "[t]he housing stock of the 4700 blocks of both Ellis and Woodlawn is simply too run-down to attract market-rate tenants. The sites are also too far from the University of Chicago to attract the needed student market ***. *** [I]t is highly doubtful that a significant percentage of market-rate units could be rented at these locations with the current rent schedule [proposed in the Developers' application for IHDA funding]."

The Federal Housing Administration (FHA) also reviewed the developers' proposal and agreed to provide a mortgage repayment guarantee. The neighbors argue, and IHDA implicitly concedes, that the FHA performed a market study prior to IHDA's approval. The precise date and substance of FHA's study and approval do not appear in the record. Of some clarification, however, is IHDA's answer to the neighbors' allegations regarding IHDA acceptance of the FHA's study. Specifically, IHDA's answer stated, "IHDA admits that it conducts formal market studies before making a loan commitment on an uninsured mortgage loan; that it conducted a less formal, although wholly adequate, market study with respect to the Proposed Development (as is IHDA's customary practice with all other FHA developments, where the FHA conducts a market analysis); and that the mortgage loan for the Proposed Development is insured by the FHA."

The neighbors instituted their litigation challenging IHDA's provision of assisted mortgage financing for the proposed development on January 23, 1985. It is undisputed that plaintiffs include both black and white individuals and persons of varying economic circumstances. The parties also agree that the Kenwood neighborhood is, similarly, a racially and economically integrated community composed of persons of a variety of racial and economic backgrounds and that census tracts indicate that there is already subsidized housing in the area.

The sites of the Ellis and Woodlawn structures are located on the border between the Kenwood neighborhood and, in the words of the neighbors, a more "ghetto-like" area populated by poor, black per-

sons. The neighbors' complaint alleged that the section 8 income levels in the proposed development will be "even lower than the limits now in effect for persons eligible to reside in public housing projects operated by the Chicago Housing Authority." According to the neighbors, the proposed development will "substantially contribute to the already existing concentration of assisted housing" in the vicinity; "discourage the racially and economically integrated character of the Kenwood neighborhood"; and "severely impair and may totally prevent the development of market-rate, racially and economically integrated housing on the immediately adjacent parcels and throughout the Kenwood neighborhood." They claimed that IHDA failed "at any time to take into consideration [these] facts." The neighbors also alleged that the proposed development would cause a decrease in the values of their homes.

Count I of the neighbor's complaint argued in substance that IHDA was created for the purpose of providing safe and sanitary housing for persons or families of low and moderate income and that these assisted housing developments were statutorily required to be such that they avoided "undue economic homogeneity" in both the structures themselves as well as the overall area in which the structures are located. The neighbors alleged that the proposed development violated the Act's requirement of economic heterogeneity because all of the units would be available for rental by families of "very low income" under section 8 standards. They alleged that IHDA's approval of financing for the proposed development violated IHDA's statutory obligation to promote economic heterogeneity and that rehabilitation and rental of the proposed development as envisioned by IHDA would cause the neighbors severe and irreparable injury. They stated that "[u]nless enjoined ***, IHDA will violate its statutory obligations and cause severe and irreparable injury to the [neighbors] and the neighborhood in which they reside." They requested "a declaratory judgment finding and determining that IHDA may not proceed with the funding of the Proposed Development because IHDA has failed to comply with its *** statutory obligations."

In count IA the neighbors' complaint alleged in substance that IHDA had not taken the proper steps of independent review in considering the developers' proposal. Specifically, they alleged that IHDA failed to conduct a market study "to determine whether the development in question complies with the Act's standards, including those intended to generate economic diversity. In the case of the Proposed Development, IHDA abdicated its responsibility to conduct such a study or to make the analysis to determine whether the Proposed De-

velopment complies with the economic diversity requirements of the Act." The neighbors averred in essence that IHDA changed its policy of funding mixed-income housing "in order to be eligible for and to receive the benefit of funds made available under the federal Section 8 Program [of HUD]." They claimed that in so doing "IHDA knowingly abdicated its statutory responsibilities under the Act."

The neighbors stated that IHDA was not required to "disregard its Illinois statutory obligations" in order to receive section 8 program benefits. They observed that "[u]nder the Section 8 Program, IHDA is free to use Section 8 funds to support assisted units in developments that are part market-rate and part assisted." They noted that IHDA had developed such projects in the past, including some in the Kenwood neighborhood. They claimed that "[t]hrough such projects IHDA is able to realize the benefits of the Section 8 Program while fulfilling its Illinois statutory duty to promote economic diversity in its developments." They also observed that IHDA failed to request a waiver of HUD's "very low income" requirements, even though IHDA could have requested such a waiver.

The neighbors' complaint concluded that IHDA's actions were "in disregard of its statutory responsibilities under the Act to promote housing for persons of varied economic means," that IHDA had "abdicated and failed to exercise its independent Illinois statutory responsibilities or any discretion vested in it by the Act," and that "IHDA's actions with respect to the Proposed Development are unlawful, inconsistent with its statutory mandate and constitute arbitrary and capricious action." The neighbors requested a declaratory judgment to this effect.

Count IB of the complaint, based upon the pertinent allegations in Counts I and IA, requested the issuance of a common law writ of *certiorari*. The neighbors alleged that "[a]t no time prior to its approval of the Proposed Development did IHDA give any consideration whatever, or exercise any discretion whatever, with respect to the statutory requirements for economic integration ***." They claimed that they were entitled to the relief of a common law writ of *certiorari* "against IHDA because (a) by virtue of IHDA's failure to consider or exercise any discretion with respect to the statutory requirements for economic integration ***, IHDA failed to follow the minimum procedures required of it under the Act, and (b) IHDA's action in approving the proposed Development was contrary to the manifest weight of the evidence, and was also unlawful in that IHDA failed to even consider evidence relating to the statutory requirements for economic integration."

IHDA's verified answer to the neighbors' complaint was comprised, in substance, of a denial that the funding of the development was not within the scope of IHDA's authority or that IHDA had abdicated its statutory obligations or otherwise abused its discretion. It also included numerous reports, letters, and other documents to indicate that IHDA had performed an informal market study, solicited comments from public officials and organizations regarding the development, and thereby considered the impact of the proposed development.

IHDA's answer interposed six affirmative defenses to the neighbors' action: (1) the neighbors lacked standing; (2) IHDA's decision was not subject to judicial review; (3) the Illinois legislature had not conferred a private right of action upon the neighbors; (4) IHDA's actions were within its statutory authority; (5) the neighbors' complaint failed to state a cause of action against IHDA; and (6) the neighbors' complaint was barred by *laches*.

IHDA subsequently filed a motion for judgment on the pleadings pursuant to section 2—615(e) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—615(e)). Following briefing and oral argument by the parties, the trial court granted IHDA's motion in a written order which provided that IHDA's motion for judgment on the pleadings was granted "for all the reasons stated in the Court's statements on March 6 and March 7, 1985, transcripts of which are attached hereto as Exhibits A and B and incorporated herein by reference." The trial court's stated reason for judgment in favor of IHDA was, in essence, that the neighbors lacked standing to challenge IHDA's decision to provide assisted mortgage financing for the proposed development. The court's remarks, however, touched upon all of the first four affirmative defenses alleged by IHDA in its answer to the neighbors' complaint (*i.e.*, standing, nonreviewability, no private right of action, proper exercise of discretion). The neighbors' timely appeal followed.

OPINION

The instant appeal presents significant and novel questions with respect to the right of neighbors to challenge, and the power of a court to review, the decision of IHDA to provide assisted mortgage financing to a particular housing development. For the reasons stated more fully hereinafter, we conclude as follows:

 (1). The Act does not place beyond the scope of judicial review the funding decision of IHDA which the neighbors challenge in their complaint. The language of section 10 of the Act

(Ill. Rev. Stat. 1985, ch. 67½, par. 310) to the effect that IHDA shall, in its "sole judgment," determine that the "estimated benefit" of its funding has been properly allocated among the number of assisted units and the rental charges therefor, does not preclude judicial review of IHDA's decision at issue here.

(2). The neighbors have standing to seek judicial review of IHDA's financing of the proposed development, since they allege a legally protectable interest, *viz*, economic injury resulting from a decrease in the values of their properties. Assuming *arguendo* that standing under Illinois law requires that a plaintiff be an "intended beneficiary" or within the "zone of interest" of the Act, the Act contemplates that homeowners neighboring a development would be such beneficiaries with respect to the neighbors' claims in the present cause.

(3). The IHDA Act imposes upon IHDA the duty to avoid undue economic homogeneity in the composition of tenants who reside in IHDA-funded projects and in the project's overall effect upon the community in which the development is located. The IHDA Act does not obligate IHDA to affirmatively promote economic integration. To the extent that the neighbors argue that IHDA has an affirmative obligation to actively promote economic integration, we find their analysis incorrect. Nevertheless, we also disagree with IHDA's claim that it is not obligated under the Act to even consider whether the proposed development will avoid undue economic homogeneity with regard to the tenant composition in the development itself as well as in the neighborhood overall. Since the allegations in the parties' pleadings dispute whether IHDA properly exercised its discretionary authority to fund projects that avoid economic homogeneity when IHDA agreed to provide assisted mortgage financing for the proposed development and whether IHDA improperly delegated to HUD or the FHA the discretionary authority placed upon IHDA to determine whether a proposed development avoids economic homogeneity, we reverse the trial court's entry of judgment on the pleadings in favor of IHDA and remand the matter for further proceedings consistent with the views expressed herein.

JUDICIAL REVIEW OF IHDA'S DECISION

The comments of the trial court which were incorporated into its final judgment indicate that the court found that the decision of IHDA to provide assisted mortgage financing for the proposed devel-

opment is not reviewable by a court of law. The court reached the conclusion that IHDA's decision is beyond the scope of judicial review by virtue of certain language in section 10 of the IHDA Act regarding IHDA's "sole judgment" to allocate the estimated benefit of IHDA's financing among the number and rental prices of assisted units in a development. (See Ill. Rev. Stat. 1985, ch. 67½, par. 310.) Because section 10 must be interpreted in the overall context of the IHDA Act, we note the other provisions of the Act which pertain to IHDA's authority to approve assisted mortgage financing for a proposed development.

The IHDA Act confers numerous powers upon IHDA. (See Ill. Rev. Stat. 1985, ch. 67½, pars. 307 through 307.25.) Included in these authorities is the power to make mortgage loans for the rehabilitation of "such developments as in the judgment of the Authority have promise of supplying, on a rental, cooperative, condominium or home ownership basis, well planned, well designed energy-efficient housing for low or moderate income persons or families at low or moderate rentals in locations where there is a need for such housing." Ill. Rev. Stat. 1985, ch. 67½, par. 307.2.

Section 12 of the Act sets forth a variety of methods to reduce the rent charges of units designated for occupancy by families of low or moderate income. The provision states that these devices are designed to "encourage developments which are not economically homogeneous and to achieve rent charges which will make units available to persons and families of low income at low rentals." (Ill. Rev. Stat. 1985, ch. 67½, par. 312.) The section provides that the "method of achieving lower rental charges shall, in each instance, be prescribed by the Authority." Ill. Rev. Stat. 1985, ch. 67½, par. 312.

■ Section 10 of the Act requires that IHDA approve a tenant selection plan before making a loan commitment for the rehabilitation of a development. It grants to IHDA the authority to formulate regulations respecting the criteria for such plans. The section states that criteria adopted by IHDA "shall include income limits" and that the "income limits shall be sufficiently flexible to avoid undue economic homogeneity among the tenants of a development." (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) The provision further states that the income-limit criteria formulated by IHDA "may vary with the size and circumstances of the family unit of tenants" and that IHDA "may formulate regulations from time to time for the alteration of occupancies of tenants who exceed established income limits." Ill. Rev. Stat. 1985, ch. 67½, par. 310.

Section 10 thus directs IHDA's consideration of a proposed ten-

ant-selection plan to two concerns: the number of units to be held available for rental to low and moderate income persons and the amount of rent to be charged to these persons. The section then provides that IHDA is also obligated to estimate the financial benefit of IHDA funding, in comparison to the cost of private market financing. It further requires that IHDA's specification of the number and rental amount of assisted units "be determined in such a way that, *in the sole judgment of the Authority*, a major portion of that estimated benefit [of IHDA funding] is used to reduce rentals [charged] for [assisted] units to [rental charges] lower than that which would otherwise have been charged for those units [if they were market rate rather than assisted]." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 67½, par. 310.

Interpretation of section 10 begins with the plain meaning of the section itself, bearing in mind the overall structure of the Act. (See, *e.g.*, *Schalz v. McHenry County Sheriff's Department Merit Com.* (1986), 113 Ill. 2d 198, 201-02, 497 N.E.2d 731; *People v. Agnew* (1985), 105 Ill. 2d 275, 279, 473 N.E.2d 1319; *Chastek v. Anderson* (1981), 83 Ill. 2d 502, 510-12, 416 N.E.2d 247.) In our opinion, section 10, by its plain terms grants to IHDA's sole judgment the determination that the major portion of estimated benefit of IHDA financing has been distributed, among the number of assisted units and the reduced amounts charged therefor, in such a way that the rental charges of the assisted units in the development have been reduced below the market rate at which these units could have been rented. See generally *Murphy v. Epes* (1984), 283 Ark. 517, 678 S.W.2d 352; *Massachusetts Housing Finance Agency v. New England Merchants National Bank* (1969), 356 Mass. 202, 249 N.E.2d 599; *Minnesota Housing Finance Agency v. Hatfield* (1973), 297 Minn. 155, 210 N.W.2d 298; *Infants v. Virginia Housing Development Authority* (1980), 221 Va. 659, 272 S.E.2d 649.

■ We need not reach the question of whether section 10 specifically and explicitly precludes judicial review. (See generally *Rossetti Contracting Co. v. Court of Claims* (1985), 109 Ill. 2d 72, 78, 485 N.E.2d 332.) Assuming that the phrase "sole judgment" bars judicial review, this assumed limitation upon judicial inquiry would pertain only to IHDA's obligation to determine that its financing will have the effect of reducing the rental charges of assisted units. Any such assumed limitation upon judicial review would not also apply to other IHDA determinations regarding the propriety of a proposed tenant selection plan, such as the consideration of whether the plan "avoid[s] undue economic homogeneity among the tenants of a development"

(Ill. Rev. Stat. 1985, ch. 67½, par. 310). (*Cf. Maas v. Board of Trustees* (1981), 94 Ill. App. 3d 562, 572, 418 N.E.2d 1029, *appeal denied* (1981), 85 Ill. 2d 566 (common law writ of *certiorari* applies to actions of agency where statutory provisions do not make reference to administrative review law, even though other provisions in same statute do refer to administrative review law); see generally 5 K. Davis, Administrative Law Treatise sec. 28.13, at 312 (2d ed. 1984).) Based upon this interpretation of section 10, we find unpersuasive IHDA's claim that section 10 renders nonreviewable all aspects of IHDA's decision to provide assisted mortgage financing for the proposed development on the basis of the tenant selection plan which the developers submitted for IHDA approval. Accordingly we conclude that IHDA's decision to finance the proposed development, as challenged by the neighbors here, is not beyond the power of the court to review.

STANDING

The trial court also concluded that judgment on the pleadings in favor of IHDA was proper because the neighbors lack standing. In this regard the court made two determinations, *viz*, that the neighbors are not the intended beneficiaries of the IHDA Act and that their allegations did not warrant an implied right of action under the Act. We consider the first reason, but need not reach the merits of the second.

■ Illinois Supreme Court precedent with regard to standing establishes the following: "Standing requires some injury in fact to a legally recognized interest. [Citation.]" (*Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 254, 483 N.E.2d 1263, 1268.) Standing rules of similar substance have been enunciated and applied with respect to actions for common law *certiorari* and declaratory judgments. See, *e.g.*, *Underground Contractors Association v. City of Chicago* (1977), 66 Ill. 2d 371, 375-76, 362 N.E.2d 298 (declaratory judgment); *People ex rel. Elmore v. Allman* (1943), 382 Ill. 156, 164, 46 N.E.2d 974 (common law *certiorari*); see also Ill. Rev. Stat. 1985, ch. 110, pars. 2—701 (declaratory judgment), 3—101 *et seq.* (administrative review).

■ The neighbors assert that IHDA's funding of the proposed development will cause injury to the sound growth and development of the racially and economically integrated community of which they are residents and that the proposed development will cause a decrease in the economic values of their properties. Thus the interests that they assert are based upon injuries caused by allegedly wrongful action of

an administrative agency to the detriment of their interests in their community and in their residences.

We need not decide whether injury to the interest of living in a viable, racially and economically integrated community is sufficient in itself to confer standing (see generally, *e.g., Havens Realty Corp. v. Coleman* (1982), 455 U.S. 363, 375-78, 71 L. Ed. 2d 214, 227-29, 102 S. Ct. 1114, 1122-24; *Gladstone Realtors v. Village of Bellwood* (1979), 441 U.S. 91, 114, 60 L. Ed. 2d 66, 85-86, 99 S. Ct. 1601, 1615; *Trafficante v. Metropolitan Life Insurance Co.* (1972), 409 U.S. 205, 211, 34 L. Ed. 2d 415, 420, 93 S. Ct. 364, 367-68; *Alschuler v. Department of Housing & Urban Development* (7th Cir. 1982), 686 F.2d 472, 478; *Shannon v. U.S. Department of Housing & Urban Development* (3d Cir. 1980), 436 F.2d 809, 817-18; 5 K. Davis, Administrative Law Treatise sec. 22:02—5, at 344 (Supp. 1982)), as "palpable economic injuries have long been recognized as sufficient to lay the basis for standing with or without a specific statutory provision for judicial review. [Citation.]" (*Stanley Magic-Door, Inc. v. City of Chicago* (1979), 74 Ill. App. 3d 595, 597, 393 N.E.2d 535, 537; see also *Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill. 2d 516, 524-25, 449 N.E.2d 69.) Since the neighbors allege that IHDA's actions will cause them economic injury with respect to the values of their properties, we conclude that they have standing to challenge IHDA's decision to provide assisted mortgage financing for the proposed development.

IHDA claims that the neighbors lack standing because they are not members of the group which the IHDA Act was intended to benefit. It contends that the Act is designed to protect only those individuals who will reside in assisted housing and thus does not extend its benefits to neighbors of assisted housing.

We note first that the "zone of interest" or "intended beneficiaries" standard which IHDA suggests is derived from Federal jurisprudence regarding a party's standing to litigate a claim in that court. (See *Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 747-48, 359 N.E.2d 1137, citing *Association of Data Processing Service Organizations, Inc. v. Camp* (1970), 397 U.S. 150, 153-54, 25 L. Ed. 2d 184, 188, 90 S. Ct. 827, 830; see generally 4 K. Davis, Administration Law Treatise sec. 24:17, at 273 (2d ed. 1983).) We do not reach the question of whether the "zone of interest" or "intended beneficiaries" standard should be applied to the instant cause, however. (*Cf. Cusack v. Howlett* (1969), 44 Ill. 2d 233, 236, 254 N.E.2d 506 (Federal standard not applied to doctrine of ripeness under Illinois law).) Even assuming *arguendo* that the doctrine were properly adopted into Illinois standing jurisprudence, we conclude that the neighbors would be consid-

ered "intended beneficiaries" protected by the IHDA Act with respect to the allegations they raise in their complaint.

■■ ■ The "intended beneficiaries" or "zone of interest" test "requires that the plaintiff be one of the class designed to be protected by the statute, or for whose benefit the statute was enacted, and to whom a duty of compliance is owed. [Citations.] The object of the statute, the nature of the duty imposed by it, and the benefits resulting from its performance dictate what persons are entitled to sue thereunder. [Citation.]" (*Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 748, 359 N.E.2d 1137, 1140; see also *Wade v. Kramer* (1984), 121 Ill. App. 3d 377, 383, 459 N.E.2d 1025, *appeal denied* (1984), 101 Ill. 2d 552.) In other words, the zone-of-interest test looks to the objectives the Act seeks to accomplish and the evils it is designed to remedy. Consideration of the legislative finding and declaration is thus particularly appropriate in this analysis. See generally *City of Springfield v. Board of Election Commissioners* (1985), 105 Ill. 2d 336, 341, 473 N.E.2d 1313; *Chastek v. Anderson* (1981), 83 Ill. 2d 502, 510, 416 N.E.2d 247; *Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 61, 387 N.E.2d 320, *cert. denied* (1979), 444 U.S. 844, 62 L. Ed. 2d 57, 100 S. Ct. 87; *Brown v. Kirk* (1976), 64 Ill. 2d 144, 152-53, 355 N.E.2d 12.

■■ The IHDA Act's express statement of legislative finding and declaration enumerates the "unacceptable conditions in the State which require the creation" of IHDA "with power to issue notes and bonds in order to make loans for the *** rehabilitation of housing." (Ill. Rev. Stat. 1985, ch. 67½, par. 303; see also 1967 Public Laws 1931, at 1934 (section 3).) The first paragraph of the Act's finding and declaration expressly recognizes that "the spread of slum conditions and blight to formerly sound neighborhoods" has caused a "serious shortage of decent, safe and sanitary [assisted] housing." (Ill. Rev. Stat. 1985, ch. 67½, par. 303.) The Act also expresses the view that this shortage is "inimical" not only to the residents of this State in general, but also to the "sound growth of its communities" in particular. (Ill. Rev. Stat. 1985, ch. 67½, par. 303.) The Act's declaration specifically states that the course chosen by the Act to eliminate these problems is to encourage private enterprise to "rehabilitate housing which will help prevent the recurrence of slum conditions and assist in their permanent elimination by housing persons of varied economic means in the same structures and neighborhoods." Ill. Rev. Stat. 1985, ch. 67½, par. 303.

In our view the legislature's statement of declaration and finding demonstrates that the Act's objective is not merely to aid in the pro-

vision of safe and sanitary assisted housing. Instead the Act's goal is to encourage that this housing be situated in "sound communities" where persons "of varied economic means [are housed] in the same structures and neighborhoods." (Ill. Rev. Stat. 1985, ch. 67½, par. 303.) This legislative policy was adopted in order to "prevent the recurrence of slum conditions" and the "blight [of] formerly sound neighborhoods" (Ill. Rev. Stat. 1985, ch. 67½, par. 303) which had already occurred. In other words, the purpose of the Act is not only to aid in the eradication of unsafe and unsanitary assisted housing, but also to assist in the elimination of ghetto-like assisted-housing areas as well. See generally *Tedford v. Massachusetts Housing Finance Agency* (1984), 390 Mass. 688, 459 N.E.2d 780; *Zoning Board of Appeals v. Housing Appeals Committee* (1982), 385 Mass. 651, 433 N.E.2d 873; *Massachusetts Housing Finance Agency v. New England Merchants National Bank* (1969), 356 Mass. 202, 249 N.E.2d 599; *Minnesota Housing Finance Agency v. Hatfield* (1973), 297 Minn. 155, 210 N.W.2d 298.

Given these legislative statements of the policy behind adoption of the IHDA Act, we are unable to conclude that homeowners neighboring a proposed development are or should be precluded from seeking judicial review of IHDA's decision to provide financing for the development. In our view the Act is intended to benefit both persons of low or moderate income who will reside in the development and also residents of the community in which the development is located. All of these individuals have an interest in ensuring that assisted housing is located in viable, economically integrated communities. We note that the view that neighbors possess standing to seek judicial review of HUD's housing assistance determinations also finds support in Federal jurisprudence. See *Kirby v. United States Department of Housing & Urban Development* (3d Cir. 1982), 675 F.2d 60; *Alschuler v. United States Department of Housing & Urban Development* (7th Cir. 1982), 686 F.2d 472 (applying zone of interest test); *Shannon v. United States Department of Housing & Urban Development* (3d Cir. 1970), 436 F.2d 809.

■■ Nor do we agree with IHDA that the Act's reference to the need to utilize "cost-effective construction materials and techniques *** [in order to assure affordable heat to [prospective low and moderate income tenants] who are the intended beneficiaries of this Act" (Ill. Rev. Stat. 1985, ch. 67½, par. 303) deprives the neighbors of standing to challenge IHDA's decision at issue here. The possibility that the neighbors may not be the "intended beneficiaries" of the Act's reference to the use of cost-effective construction materials and

techniques in housing construction does not require the conclusion that the neighbors are not the "intended beneficiaries" of the Act's references to the eradication of "slum conditions" through economically mixed housing. There is no inherent interrelationship between cost-effective construction materials and the degree of economic integration in a community. See generally *Alschuler v. United States Department of Housing & Urban Development* (3rd Cir. 1970), 686 F.2d 472, 479-80.

In light of the determinations set forth above, we need not resolve the question of whether the IHDA Act implies a private right of action to seek judicial review of IHDA's funding decisions challenged here. See *Chrysler Corp. v. Brown* (1979), 441 U.S. 281, 317, 60 L. Ed. 2d 208, 234, 99 S. Ct. 1705, 1725; *Rapid Transit Advocates, Inc. v. Southern California Rapid Transit District* (9th Cir. 1985), 752 F.2d 373, 378; see also *Latinos Unidos De Chelsea En Accion (LUCHA) v. Secretary of Housing & Urban Development* (1st Cir. 1986), 799 F.2d 774; *Haskins v. Stanton* (7th Cir. 1986), 794 F.2d 1273.

### IHDA's Authority and Its Alleged Abuses Thereof

For the sake of clarity, we reiterate that our review of the record indicates that the parties' arguments and the trial court's conclusion do not clearly distinguish between two possible conceptions of IHDA's alleged "statutory obligation of economic integration." This statutory obligation may be interpreted as either an obligation to actively promote economic integration or heterogeneity or an obligation to avoid economic segregation or homogeneity. In light of these circumstances, we consider whether judgment on the pleadings in favor of IHDA was properly entered either on the basis that IHDA has no obligation to affirmatively promote economic integration or on the basis that IHDA has no duty to avoid economic homogeneity.

We consider first whether the IHDA Act obligates IHDA to affirmatively promote economic integration among the developments for which it provides assisted mortgage financing. Our analysis of the Act finds no support for the conclusion that IHDA has a duty to actively promote economic integration. Although we recognize that one of the implicit objectives of the IHDA Act is to avoid either the perpetuation of economic segregation in an area or the resegregation of a community in this manner, we are not persuaded that the Act is intended to achieve this goal by imposing upon IHDA the duty to exercise its discretion in such a way that the agency must affirmatively promote economic integration in the developments for which it pro-

vides assisted mortgage financing.

None of the statutory language referred to by the neighbors' complaint calls for the active pursuit of the goal of "economic integration." Instead all speak to the avoidance of a negative evil—"economic homogeneity"—to the greatest extent possible in a given context in order to provide safe and sanitary assisted housing. Thus the Act tolerates a certain degree of "economic homogeneity."

The Act's tolerance of a degree of "economic homogeneity" is evident in each of the sections referred by the neighbors in the present cause. For example, in section 10, the legislature provided that IHDA approval of a tenant selection plan is appropriate where the plan "avoid[s] undue economic homogeneity." (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) In a similar manner section 12 speaks of IHDA's obligation to "encourage developments which are not economically homogeneous." (Ill. Rev. Stat. 1985, ch. 67½, par. 312.) The Act's finding and declaration notes that the purpose of the Act is to "rehabilitate housing which will *help prevent* the recurrence of slum conditions and *assist* in their permanent elimination by housing persons of varied economic means in the same structures and neighborhoods." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 67½, par. 303.) As a result, although the Act indicates a preference for developments that are economically heterogeneous, it recognizes that a certain degree of "homogeneity" may result in particular projects in order to achieve the Act's goals of providing safe and sanitary assisted housing in a manner which does not promote the recurrence of slums and does not cause a disintegration of sound communities.

We also do not believe that IHDA's past interpretation of the IHDA Act, as evidence in IHDA's February 1983 letter to HUD regarding Federal regulations proposed to implement the 1981 amendments to the section 8 program, present evidence that IHDA had a binding customary practice whereby the agency itself viewed its statutory obligation as an affirmative duty to promote economic integration.

Initially, we question whether IHDA's February 1983 letter to HUD could be reasonably construed as evidence of a binding administrative policy that IHDA considered itself statutorily obligated to actively promote economic integration. The letter notes no more than the goal of IHDA to achieve economic integration as much as possible in the projects it has funded. This is not, in our opinion, the equivalent to a perception by IHDA that it was obligated under the Act to affirmatively promote economic integration. In addition, IHDA's administrative rules, as the neighbors themselves have pointed out to

this court, do not reflect that IHDA considered itself bound under the Act to affirmatively promote economic heterogeneity. Instead, IHDA's regulation provides that in considering approval of a proposed tenant selection plan IHDA shall consider whether the plan will "promote a heterogeneous mix of income levels to the extent appropriate." (47 Ill. Admin. Code sec. 310. 701(a) (1985).) Thus IHDA regulations do not demonstrate that IHDA considered itself bound to actively pursue economic heterogeneity in each of the developments it financed. See *Inwang v. Community College District No. 508* (1983), 117 Ill. App. 3d 608, 613, 453 N.E.2d 896; *Holland v. Quinn* (1978), 67 Ill. App. 3d 571, 574-75, 385 N.E.2d 92; see also *Citizens State Bank v. Johnson* (1985), 130 Ill. App. 3d 925, 931-32, 474 N.E.2d 791, *appeal denied* (1986), 111 Ill. 2d 580.

 Assuming *arguendo* that IHDA did have an agency custom of considering itself obligated, under the Act, to affirmatively promote economic integration, this agency custom would not be binding upon this court in its determination of the scope of IHDA's legal authority under the Act. It is well settled that a court is not bound by an agency's interpretation of the agency's statutory authority. (See *Rossetti Contracting Co. v. Court of Claims* (1985), 109 Ill. 2d 72, 78, 485 N.E.2d 332; *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 370 N.E.2d 3, *appeal denied* (1978), 71 Ill. 2d 599.) That IHDA may have attempted, in the past and where fiscally possible, to actively promote a significant degree of economic integration in the developments it has funded, does not compel the conclusion that it is statutorily obligated, regardless of either the circumstances of particular instances or the fiscal resources available to IHDA, to do so in all of its future decisions to finance assisted housing projects. *Cf. Rivera v. Department of Public Aid* (1985), 132 Ill. App. 3d 213, 476 N.E.2d 1143; *Miller v. Department of Public Aid* (1981), 94 Ill. App. 3d 11, 418 N.E.2d 178, *appeal denied* (1981), 85 Ill. 2d 566.

Nevertheless, we disagree with the position of IHDA that it is not obligated under the Act to give any consideration whatsoever to whether the proposed development will avoid undue economic homogeneity. In this regard, IHDA argues that its discretionary authority to approve assisted mortgage financing for a particular development encompasses the discretion to disregard consideration of whether a particular tenant selection plan avoids undue economic homogeneity. Stated differently, we find without merit IHDA's position that it has no statutory obligation to avoid economic homogeneity in the developments for which it provides assisted mortgage financing.

"An administrative agency *** is a creature of statute and has no

general or common law powers. [Citation.] Any power or authority claimed by an administrative agency must find its source within the provisions of the statute by which the agency was created. [Citation.] The authority of the [agency] must either arise from the express language of the [statute], or devolve by fair implication and intendment from the express provisions of the Act as an incident to achieving the objectives for which the [agency] was created. [Citations.]" *Schalz v. McHenry County Sheriff's Department Merit Com.* (1986), 113 Ill. 2d 198, 202-03, 497 N.E.2d 731, 732-33; see also *Rossetti Contracting Co. v. Court of Claims* (1985), 109 Ill. 2d 72, 78, 485 N.E.2d 332; *Aurora East Public School District No. 131 v. Cronin* (1982), 92 Ill. 2d 313, 326-27, 442 N.E.2d 511; *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 551, 370 N.E.2d 223; *Ruby Chevrolet, Inc. v. Department of Revenue* (1955), 6 Ill. 2d 147, 151, 126 N.E.2d 617.

 In our opinion, the Act places upon IHDA the affirmative duty to exercise its discretion in a manner that takes into account the degree, if any, to which a particular tenant selection plan avoids undue economic homogeneity in a particular development, and the degree, if any, to which a particular development avoids economic segregation in the community in which the project is located. Thus the Act states, in mandatory language, that IHDA "shall approve a tenant selection plan" "[p]rior to making a loan commitment for a development under this Act." (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) It further mandates that the "Authority shall formulate regulations *** setting forth the criteria for tenant selection plans." (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) The Act requires that these criteria "shall include income limits [that] shall be sufficiently flexible to avoid undue economic homogeneity among the tenants of a development." (Ill. Rev. Stat. 1985, ch. 67½, par. 310.) Since the tenant selection plan must conform to IHDA criteria, and IHDA criteria must "avoid undue economic homogeneity among the tenants of a development," it follows that any tenant selection plan approved by IHDA must "avoid undue economic homogeneity." Ill. Rev. Stat. 1985, ch. 67½, par. 310; see also Ill. Rev. Stat. 1985, ch. 67½, par. 312; see generally Ill. Rev. Stat. 1985, ch. 67½, par. 303.

It is evident that the legislature enacted this mandatory language so that IHDA would achieve the legislature's goal that "private enterprise be encouraged to *** rehabilitate housing which will help prevent the recurrence of slum conditions and assist in their permanent elimination by housing persons of varied economic means in the same structures and neighborhoods." (Ill. Rev. Stat. 1985, ch. 67½, par.

303.) To achieve this end, the Act anticipates a degree of economic mix among the tenants of a development assisted by IHDA financing. See generally *Murphy v. Epes* (1984), 283 Ark. 517, 678 S.W.2d 352; *Massachusetts Housing Finance Agency v. New England Merchants National Bank* (1969), 356 Mass. 202, 249 N.E.2d 599; *Minnesota Housing Finance Agency v. Hatfield* (1973), 297 Minn. 155, 210 N.W.2d 298; *Infants v. Virginia Housing Development Authority* (1980), 221 Va. 659, 272 S.E.2d 649.

We note that counts I and IA of the neighbors' complaint sought declaratory judgments. Because IHDA does not argue on appeal, and did not contend before the trial court, that declaratory judgment is an inappropriate legal theory upon which to rely in order to challenge the financing decision of IHDA at issue here, we assume that such relief is properly sought in the context of the instant cause. Similarly, since IHDA has never disputed whether an order of common law *certiorari* (as requested in count IB) is a proper method of judicial review, we assume for the purposes of analysis that *certiorari* is also properly requested in the present context.

■■■ However, IHDA argues that judgment on the pleadings was properly entered by the trial court on the theory that Illinois jurisprudence disfavors a court's issuance of mandatory injunctive relief to control or limit a public official's exercise of a discretionary authority "absent fraud, corruption, oppression or gross injustice." (*People v. Roush* (1984), 101 Ill. 2d 355, 365, 462 N.E.2d 468, 472.) In our view, "[t]hat does not mean, however, that all administrative determinations are sacred and beyond the reach of the courts. Where an administrative order is against the manifest weight of the evidence or where the agency has acted arbitrarily or capriciously and has thereby abused the discretion vested in it, the courts should not hesitate to intervene." *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 207, 326 N.E.2d 406, 408; see also, *e.g., Rocke v. County of Cook* (1978), 60 Ill. App. 3d 874, 875-76, 377 N.E.2d 287; *Hall v. Board of Education* (1977), 48 Ill. App. 3d 834, 841, 363 N.E.2d 116, *appeal denied* (1977), 66 Ill. 2d 630, *cert. denied* (1978), 434 U.S. 1056, 55 L. Ed. 2d 757, 98 S. Ct. 1225.

Whether the trial court should enter a mandatory injunction to specifically regulate or limit the manner in which IHDA reaches its financing decisions is, at most, only one of several remedies which the trial court could impose upon remand, assuming the neighbors prevail in their underlying causes of action and assuming they demonstrate that such relief would be appropriate. (See *e.g., Haskins v. Stanton* (7th Cir. 1986), 794 F.2d 1273; *Alschuler v. United States Department*

*of Housing & Urban Development* (7th Cir. 1982), 686 F.2d 472; *Schalz v. McHenry County Sheriff's Department Merit Com.* (1986), 113 Ill. 2d 198, 497 N.E.2d 731; *Newkirk v. Bigard* (1985), 109 Ill. 2d 28, 485 N.E.2d 321, *cert. denied* (1986), 475 U.S. 1140, 90 L. Ed. 2d 335, 106 S. Ct. 1789; *Jones v. Board of Fire & Police Commissioners* (1984), 127 Ill. App. 3d 793, 469 N.E.2d 393, *appeal denied* (1985), 101 Ill. 2d 589; *cf. Smith v. Department of Public Aid* (1977), 67 Ill. 2d 529, 367 N.E.2d 1286; Ill. Rev. Stat. 1985, ch. 110, par. 11—107.) Under these circumstances, we are of the opinion that the rule of *People v. Roush* (1984), 101 Ill. 2d 355, 462 N.E.2d 468, regarding the limited instances wherein a trial court should award permanent injunctive relief to limit or prescribe the actions of a public official, does not and should not foreclose the neighbors' right to an adjudication of the merits of their claims.

The IHDA Act places upon IHDA a duty to avoid economic homogeneity in the developments for which it provides assisted mortgage financing. The parties' pleadings present factual allegations which materially dispute whether IHDA considered if the proposed development would avoid undue economic homogeneity among the tenants of the development at issue in the case at bar and whether IHDA improperly delegated to HUD or the FHA IHDA's discretionary authority to take into consideration whether the proposed development would avoid undue economic homogeneity. Consequently, we conclude that the trial court erred in its entry of judgment on the pleadings in favor of IHDA with respect to counts I, IA, and IB of neighbors' complaint.

For the reasons stated above, we reverse the trial court's orders with respect to counts I, IA, and IB against IHDA and remand the cause to the trial court for further proceedings in accordance with the views expressed herein.

II. CHICAGO ZONING ORDINANCE VIOLATION

BACKGROUND

The neighbors alleged in count II of their complaint that the proposed development violated provisions of the Chicago zoning ordinance (Chicago Municipal Code, ch. 194A, sec. 1 *et seq.* (1984-85)). They claimed in substance in this count that the nature of the construction planned by the developers would constitute an addition to or enlargement of the Woodlawn and Ellis Avenue structures, both of which are nonconforming as to bulk, and that as such the rehabilitation conflicted with article 6.4—2 of the zoning ordinance (Chicago

Municipal Code, ch. 194A, sec. 6.4—2 (1984-85)). Section 6.4—2 provides in pertinent part that when a building that is nonconforming as to bulk is added to or enlarged, both the building and the addition or enlargement must conform to certain specified bulk standards. See Chicago Municipal Code, ch. 194A, sec. 6.4—2 (1984-85).

Because the trial court dismissed the count for failure to state a claim for which relief could be granted, pursuant to the developers' motion (see Ill. Rev. Stat. 1985, ch. 110, par. 2—615), we accept as true all well-pleaded facts in the complaint in order to determine whether the trial court's order was proper. See *Bond v. Dunmire* (1984), 129 Ill. App. 3d 796, 804, 473 N.E.2d 78.

The proposed development would convert the Ellis structures into 27 two- and three-bedroom units. The Woodlawn structure would consist of 21 three- and four-bedroom apartments. Rehabilitation will require substantial reconstruction and reconfiguration of virtually all interior walls of the presently existing buildings, including the addition of numerous full floor-to-ceiling partitions, the filing in with masonry of existing wall openings, and other substantial construction. It is undisputed that the Woodlawn and Ellis structures are "non-conforming as to bulk."

The trial court dismissed count II for failure to state a claim on the ground that the terms "added to" and "enlarged" in section 6.4—2 of the Chicago zoning ordinance pertain only to increases in the "bulk" of a building and not to the rehabilitation of a structure. It also determined that the neighbors' suggested interpretation of section 6.4—2 would "render illusory" the provisions of the Chicago rehabilitation code. (Chicago Municipal Code, ch. 78.1, sec. 78.1—1 *et seq.* (1983)). The neighbors' appeal followed.

OPINION

■■ The precise question presented for our resolution is whether the neighbors' complaint failed to state a claim that the proposed development amounts to an "addition to or enlargement of" the Woodlawn and Ellis structures such that the development must conform to current bulk standards. The neighbors argue on appeal that the terms "added to or enlarged" can apply to changes in both exterior and interior conditions of a structure and that their interpretation of this language is consistent with the rehabilitation code.

Article 6 of the zoning ordinance pertains to nonconforming buildings, structures, and uses. (Chicago Municipal Code, ch. 194A, secs. 6.1 to 6.6 (1984-85).) As pertinent here, the purpose of the article is to regulate and gradually eliminate those nonconforming buildings

"which adversely affect the maintenance, development or use and tax-able value of other property in the district in which they are located." Chicago Municipal Code, ch. 194A, sec. 6.1 (1984-85); see also Chicago Municipal Code, ch. 194A, sec. 2(14) (1984-85).

Under the terms of the Chicago zoning ordinance, a building may be nonconforming with respect to its bulk, its overall designed use, or its actual existing use. (See Chicago Municipal Code, ch. 194A, secs. 3.2, 6.1—1 (1984-85).) "Bulk" is defined in the zoning ordinance as "the term used to indicate the size and setbacks of buildings or struc-tures and the location of same with respect to one another." (Chicago Municipal Code, ch. 194A, sec. 3.2 (1984-85).) The term includes the size and height of a building, the location of exterior walls at all levels in relation to lot lines, streets, or to other buildings, the gross floor area of buildings in relation to the lot area, all open spaces allocated to a building, and the amount of lot area provided per dwelling unit. Chicago Municipal Code, ch. 194A, sec. 3.2(a)—(e) (1984-85).

The ordinance permits "[o]rdinary repairs and alterations" to buildings that are nonconforming as to bulk, including structural alter-ations. (Chicago Municipal Code, ch. 194A, sec. 6.4—1 (1984-85).) It fur-ther provides that a "non-conforming building or structure which is nonconforming as to bulk *** shall not be added to or enlarged in any manner unless such additions and enlargements thereto are made to conform to all the regulations of the district in which it is located, and unless such non-conforming building or structure, including all addi-tions and enlargements thereto, shall conform to *** [a]pplicable regu-lations concerning the amount of lot area provided per dwelling unit and allowable floor area ratio [Article 7 of the Zoning Ordinance] ***; [t]he allowable floor area ratio and gross floor area in relation to floor area per establishment [Articles 8 and 9 of the Zoning Ordinance], and; *** [t]he allowable floor area ratio [Article 10 of the Zoning Ordi-nance]." Chicago Municipal Code, ch. 194A, sec. 6.4—2 (1984-85).

We are unable to agree with the view of the neighbors that sec-tion 6.4—2's restrictions upon any manner of addition to or enlarge-ment of a building that is nonconforming as to bulk includes the reha-bilitation intended by the developers here. We conclude that section 6.4—2, by its plain language interpreted according to the words' com-monly understood contextual meanings, places limitations upon an ad-dition to or enlargement of the bulk of a nonconforming building. We note that the section does not restrict alterations, structural repairs, or rehabilitation to a building that is nonconforming as to bulk. In-stead the section contemplates the imposition of current bulk stand-ards where the bulk of the building is increased by joining, annexing,

or uniting the building to an adjacent structure or where the building's bulk is increased in quantity or dimension, or extended in limits. Neither section 6.4—2 in particular, nor article 6 in general, contains anything to indicate that substantial rehabilitation of a building will transform that "rehabilitation" into an "addition to or enlargement of" the structure for the purposes of section 6.4—2 or article 6. Substantial rehabilitation is not synonymous to an increase in the bulk of a building.

We recognize that article 6 contemplates the gradual elimination of those nonconforming bulk structures that adversely affect the maintenance, development, and value of the neighborhood in which they are located. The article provides, however, that nonconforming bulk structures are not subject to the specific amortization schedules established in article 6. (Chicago Municipal Code, ch. 194A, sec. 6.3 (1984-85).) Moreover, the rehabilitation code (Chicago Municipal Code, ch. 78.1, sec. 78.1—1 et seq. (1983)) is premised in an implicit assumption that nonconforming bulk buildings can be lawfully rehabilitated provided the rehabilitation conforms to the zoning requirements of the city of Chicago. (See Chicago Municipal Code, ch. 78.1, secs. 78.1—1, 78.1—2 (1983); see generally In re Marriage of Pick (1983), 119 Ill. App. 3d 1061, 1065, 458 N.E.2d 33 (enactments regarding similar subjects should be construed in pari materia).) Thus the Chicago zoning ordinance presumes, as does the rehabilitation code, that the usefulness of nonconforming bulk buildings may be extended for an unspecified period of time, without violence to the principle that those nonconforming bulk structures that have an adverse impact on the district should, eventually, be eliminated.

In light of the complementary objectives of the Chicago zoning ordinance and the Chicago rehabilitation code, we concur in the determination of the trial court below that the neighbors' interpretation of section 6.4—2 would "render illusory" the provisions of the rehabilitation code with respect to rehabilitation such as that planned in the instant cause. The rehabilitation code itself recognizes the distinctions, where deemed appropriate, between moderate rehabilitation, substantial rehabilitation, and new construction, in the context of rehabilitation of a structure. (See Chicago Municipal Code, ch. 78.1, secs. 78.1—1, 78.1—2, 78.1—4, 78.1—5, 78.1—10(b), (c), 78.1—14, 78.1—22, 78.1—23, 78.1—24, 78.1—28, 78.1—29, 78.1—35, 78.1—37, 78.1—45, 78.1—46 (1983).) Thus the neighbors' position would eliminate the need for the rehabilitation code under circumstances such as the case at bar. Given these considerations, we conclude that section 6.4—2 does not prohibit the rehabilitation contemplated by the developers here. We de-

termine that the neighbors' complaint with respect to the alleged zoning violation failed to state a claim that the proposed development violates section 6.4—2 of the Chicago zoning ordinance.

 The developers also contend that the neighbors' pleading regarding an alleged zoning violation was properly dismissed because the neighbors lack "standing" to maintain such an action under section 11—13—15 of the Illinois Municipal Code. (Ill. Rev. Stat. 1985, ch. 24, par. 11—13—15.) The developers argue that the neighbors' claims were insufficient to demonstrate that the developers' alleged violation of the Chicago zoning ordinance would have a "substantial effect" on their persons or properties. We note that the developers did not raise this argument before the trial court.

Section 11—13—15 of the Illinois Municipal Code permits an action by either a municipality, or an owner or tenant of real property within 1,200 feet in any direction of property allegedly used in violation of municipal or local ordinances, to seek a variety of equitable and monetary remedies for the alleged violations. (See Ill. Rev. Stat. 1985, ch. 24, par. 11—13—15; see also *Launius v. Najman* (1984), 129 Ill. App. 3d 498, 502, 472 N.E.2d 170, *appeal denied* (1985), 102 Ill. 2d 554; *City of Chicago v. Westphalen* (1981), 93 Ill. App. 3d 1110, 1129-32, 418 N.E.2d 63, *appeal dismissed* (1982), 455 U.S. 996, 71 L. Ed. 2d 858, 102 S. Ct. 1625.) The section provides in pertinent part that any owner or tenant of real property within the specified area may institute such an action if the owner or tenant "shows that his property or person will be substantially affected by the alleged violation." (Ill. Rev. Stat. 1985, ch. 24, par. 11—13—15.) The section also states, "An owner or tenant need not prove any specific, special or unique damages to himself or his property or any adverse effect upon his property from the alleged violation in order to maintain a suit under the foregoing provisions." (Ill. Rev. Stat. 1985, ch. 24, par. 11—13—15.) The developers do not dispute that the neighbors reside within 1,200 feet of the proposed development.

The language in section 11—13—15 to the effect that an owner need not prove specific, special, unique, or adverse damage is intended to abolish case law, predating the relevant statutory amendment to this section, in which it was held that an owner, in order to obtain the injunctive relief provided for in the section, was obligated to prove that the alleged zoning violation amounted to a nuisance. (See *Richardson v. Kitchin* (1979), 75 Ill. App. 3d 961, 965, 394 N.E.2d 796; *Bull v. American National Bank & Trust Co.* (1969), 112 Ill. App. 2d 32, 39-41, 250 N.E.2d 839, *appeal denied* (1969), 42 Ill. 2d 583; *222 East Chestnut Street Corp. v. LaSalle National Bank* (1957),

15 Ill. App. 2d 460, 462-63, 146 N.E.2d 717.) In view of the amend-
ment, it is the nature of the zoning violation itself that establishes the
"substantial effect" sufficient to enable an owner or tenant within the
requisite 1,200 feet to maintain an action for injunctive relief. In this
manner the section achieves the legislative purpose of expanding the
scope of persons entitled to rely upon the section in order to seek in-
junctive redress for zoning ordinance violations (see *City of Chicago v.
Westphalen* (1981), 93 Ill. App. 3d 1110, 1130, 418 N.E.2d 63), and
thereby "exten[ds] *** [the] enforcement authority" "of the State's
police powers to enforce zoning and building ordinances to promote
the public health, welfare and safety [Citations]" "to adjacent land-
owners or tenants" (*Launius v. Najman* (1984), 129 Ill. App. 3d 498,
502, 472 N.E.2d 170, 173).

In count II of the neighbors' complaint, the neighbors alleged that
they reside within 1,200 feet of the proposed development and that
the development's violation of the Chicago zoning ordinance "poses a
substantial safety hazard to the individuals who would reside in the
building as well as to their neighbors." The neighbors' allegation of
"substantial safety hazard" to the residents and neighbors of the pro-
posed development constitutes a sufficient "substantial effect" on
their persons or properties from the alleged violation of the pertinent
ordinance to withstand the developers' motion to dismiss. We there-
fore are not persuaded by the developers' argument that the neigh-
bors lack standing to maintain an action for injunctive relief based
upon the developers' alleged violation of section 6.4—2 of the Chicago
zoning ordinance.

For the reasons stated above, we conclude that the neighbors
have standing under section 11—13—15 of the Illinois Municipal Code
to challenge the proposed development's compliance with the Chicago
zoning ordinance. We further determine that the neighbors' pleading
failed to state a claim that the developers' intended substantial reha-
bilitation of the proposed development would, in and of itself, amount
to an "addition to or enlargement of" the structures such that the
proposed development would have to conform to current bulk regula-
tions in accordance with section 6.4—2 of the Chicago zoning ordi-
nance. Accordingly, the order of the trial court that dismissed count II
for failure to state a claim is affirmed.

III. CHICAGO BUILDING AND REHABILITATION CODE VIOLATIONS

BACKGROUND
Count III of the neighbors' complaint alleged in substance that

the proposed development would violate various provisions in the Chicago building code and the Chicago rehabilitation code. Specifically the neighbors alleged in pertinent part that the proposed development was impermissible with regard to the outer courts in the Ellis structures, the basement apartments at the Ellis and Woodlawn structures, and the sanitary sewer pipe at the Ellis structures. They claimed that as a result of these deficiencies, the trial court should enjoin rehabilitation of the Ellis and Woodlawn structures. Following a hearing, the trial court entered judgment for the developers, and the neighbors appeal.

Although the trial court entered judgment for the developers following a hearing, our review of the record indicates that the factual basis for the trial court's judgment was not substantially disputed between the parties. The court's ruling was founded primarily upon the court's interpretation of various provisions of the Chicago Municipal Code determined by the trial court to be applicable to the proposed development. Therefore we restate the pertinent facts as appropriate for analysis of the propriety of the trial court's judgment with regard to the uncontroverted evidence presented in order to determine whether the evidence, when considered in light of the Chicago Municipal Code, established that judgment in favor of the developers was proper.

OPINION

STANDING

■■■ The developers contend that the neighbors' evidence failed to demonstrate their "standing" to challenge the City's issuance of building permits to the developers for the proposed development. In this regard the developers argue that the neighbors did not present evidence showing that the development will have a "substantial effect" on their person or property. See Ill. Rev. Stat. 1985, ch. 24, par. 11—13—15.

As set forth above with respect to the developers' claim that the neighbors lack standing to challenge the proposed development's compliance with the Chicago zoning ordinance, section 11—13—15 does not require a resident within the obligatory 1,200 feet to plead or prove any special or unique damage to himself or his property. In the case at bar, the neighbors claimed in count III that the proposed development's violations of the Chicago building code and the Chicago rehabilitation code "pose a substantial threat to the health and well-

being of persons who would occupy said structures." Following its hearing, the trial court commented, and we agree, that the spirit of section 11—13—15 is to permit neighbors to bring suit regarding building code violations where the municipality is slow or lax to take action. The trial court made no remark to indicate, nor did the developers argue to the trial court, that the neighbors' evidence here failed to show that the developers' violations of the Chicago building code or Chicago rehabilitation code would have a "substantial effect" upon the neighbors. Nor can this court conclude, based upon its review of the record, that the violations at issue in count III do not pose the dangers alleged in the neighbors' complaint or that these dangers would not amount to a "substantial effect" for the purposes of section 11—13—15. Under these circumstances, we reject the developers' argument that the neighbors lack "standing" under section 11—13—15 to challenge the proposed development's compliance with the Chicago building code and the Chicago rehabilitation code.

■■ We note that the developers stress that the neighbors' pleadings with regard to alleged Chicago building code and Chicago rehabilitation code violations seek administrative review of the city of Chicago's "factual findings" which resulted in the issuance of building permits with regard to the proposed development. The factual basis of the city of Chicago's issuance of building permits is not at issue, however, as the parties do not materially dispute the factual basis for the trial court's ruling with regard to count III. Instead the pertinent issues on appeal concern the legal interpretation to be given to the Chicago building code and the Chicago rehabilitation code. Although this court should consider, and has reviewed the trial court evidence of, the interpretations which the appropriate department of the city of Chicago has given to these codes in the past, we are bound to construe the codes according to their terms as a question at law. (See *Palella v. Leyden Family Service & Mental Health Center* (1980), 79 Ill. 2d 493, 498-99, 404 N.E.2d 228; see generally *Illinois Power Co. v. Illinois Commerce Com.* (1986), 111 Ill. 2d 505, 510-11, 490 N.E.2d 1255.) As a result we do not view the neighbors' claims regarding violations of the Chicago building code or the Chicago rehabilitation code from the perspective of whether the city of Chicago's issuance of building permits with respect to the proposed development was "an abuse of discretion as against the manifest weight of the evidence."

OUTER COURTS AND BASEMENT UNITS IN THE ELLIS STRUCTURES

The neighbors' challenge to the Ellis structures pertains first to whether the developers can lawfully restore the building such that the

outer courts (*i.e.*, the courtyards on either side of the structures) are only 4 feet in width. The appropriate size of the outer courts is at issue primarily because the developers propose to add basement apartments to the Ellis structures, which do not currently include basement units. The neighbors also argue that the developers' plans to repair the basement apartments in the Ellis structures for residential purposes violates the rehabilitation code and the building code because the developers' plans do not indicate that measures will be taken to ensure that the units will be impervious to water leakage.

Evidence produced at the hearing before the trial court established that the Ellis structures are composed of three adjoining, three-story buildings in an R4 residential district. (See Chicago Municipal Code, ch. 194A, sec. 7.3—4 (1984-85).) The buildings were originally constructed in 1914, with six apartments in each building. In 1951 the buildings were converted, pursuant to a building permit issued by the city of Chicago, from 6 apartments in each building to 18 units in each building. In 1952 the owner, in violation of the city's building permit, constructed 27 apartments in the center of the three buildings, instead of the permitted 18. By court order entered in 1961, the center building was deconverted from the unpermitted 27 units to 24 units.

The developers intend to rehabilitate the Ellis structures so that there are 7 units in each building, including one basement unit in each building, for a total of 21 apartments in the entire Ellis structures. Although the developers disputed before the trial court the neighbors' evidence that the Ellis structures originally had no residential basement units, and did not have any until the late 1950's or early 1960's, the developers do not dispute on appeal their intended rehabilitation proposes to increase the number of apartments in the Ellis structures by one unit greater than the number in existence when the buildings were originally constructed.

■■■ The neighbors claim that the planned rehabilitation of the Ellis structures is impermissible under the Chicago municipal code in two respects. First, with regard to the size of the outer courts, the neighbors maintain that the developers' proposed rehabilitation intends to add one dwelling unit to each building. The neighbors claim that, because of the increase in the number of dwelling units by one apartment in each building, the developers' planned rehabilitation of the Ellis structures must comply with the terms of section 78.1—22 of the rehabilitation code (Chicago Municipal Code, ch. 78.1, sec. 78.1—22 (1983)). Under section 78.1—22, where a planned rehabilitation of a building will increase the number of dwelling units by one beyond the

number constructed when the structure was originally built, outer courts of the building must be at least 8 feet in width. (See Chicago Municipal Code, ch. 78.1, sec. 78.1—22(e) (1983); Chicago Municipal Code, ch. 52, sec. 52—7 (1984-85).) The outer courts at the Ellis structures are only 4 feet in width rather than 8; the developers' plans envision no increase in the size of the courtyards.

Section 78.1—22 of the rehabilitation code states that "[i]n any residential building *** the number of dwelling units may be increased by one dwelling unit above the number of units constructed at the time the building was built, providing the *** [n]atural light and ventilation shall comply with the requirements of Chapter 81.1 [regarding natural light and ventilation requirements in new construction]." (Chicago Municipal Code, ch. 78.1, sec. 78.1—22(e) (1983).) The pertinent section of chapter 81.1 requires that outer courts be 8 feet in width. Chicago Municipal Code, ch. 81.1, sec. 81.1—1.4(c) (1984-85).

The developers argue, and the trial court so found, that the requirements of section 78.1—22 do not apply where the number of dwelling units legally authorized to exist has been converted to a number greater than that permitted when the building was originally constructed. Analysis of section 78.1—22 itself, however, finds no support for this interpretation. Under its plain language, section 78.1—22 applies where "the number of dwelling units [is] increased above the number of units constructed *at the time the building was built.*" (Emphasis added.) Chicago Municipal Code, ch. 78.1, sec. 78.1—22 (1983).

We also find unpersuasive the developers' contention that other, related sections in the rehabilitation code prevent application of section 78.1—22 to the proposed development. Section 78.1—21 simply permits an increase in the number of dwelling units, so long as "the building area [is] separated by vertical separations providing [specified] fire resistance." (Chicago Municipal Code, ch. 78.1, sec. 78.1—21 (1983).) Section 78.1—22 then sets forth the applicable requirements where one dwelling unit is added to the number of units "constructed at the time the building was built"; these requirements include the number of stories in the building, the room area and space requirements, the number of exits, and the required ceiling construction in basement dwelling units. (Chicago Municipal Code, ch. 78.1, sec. 78.1—22 (1983).) Section 78.1—23 states additional requirements where the number of units is increased by two units "above the number of units constructed at the time the building was built." (Chicago Municipal Code, ch. 78.1, sec. 78.1—23 (1983).) Section 78.1—29 provides a general listing of the various instances where the provisions of the rehabilitation code in particular, rather than the building code re-

garding new construction generally, apply where new construction is accomplished during the course of alterations or repairs to an existing building. (Chicago Municipal Code, ch. 78.1, sec. 78.1—29 (1983); see also Chicago Municipal Code, ch. 78.1, sec. 78.1—3 (1983).) Section 78.1—37 applies only where the room size of an existing apartment is altered, not where an additional dwelling unit is added to a building. Chicago Municipal Code, ch. 78.1, sec. 78.1—37 (1983).

The developers' reliance upon section 78—63 of the Chicago Municipal Code is equally misplaced. The purpose of section 78—63 is to permit alterations in preordinance buildings (those built before July 8, 1957) that did not "comply with the requirements in force and applicable to the building at the time of its conversion" (Chicago Municipal Code, ch. 78, sec. 78—63 (1984-85)) so that those buildings could be made to comply with chapter 78 regarding minimum requirements for existing buildings. In other words, section 78—63 directs that those buildings need not be demolished, but instead could be repaired or altered in order to comply with the Chicago Municipal Code. If, in the past, the Ellis structures had been made to comply with chapter 78, and if they were currently in compliance with chapter 78, then section 78—63 would be applicable. However, the Ellis structures are in a deteriorated and dilapidated state. The only manner in which they may be repaired to be suitable for habitation is through rehabilitation as envisioned by chapter 78.1 of the Chicago Municipal Code. Chapter 78.1 places primary reliance upon the number of dwelling units originally constructed. The rehabilitation code thus disfavors the perpetuation of prior increases in the number of dwelling units where a structure has fallen into substantial disrepair. Although this result may be unfavorable to the developers in the instant cause, we are unable to conclude that such a consequence is absurd or incongruous, as the developers maintain. It is undisputed that the Ellis structures, at the time of the developers' proposed rehabilitation, contain no apartments because the buildings are essentially "gutted" and no more than "mere shells." The structures, at the time of the proposed rehabilitation, do not consist of the dwelling units lawfully permitted in 1951 or thereafter. In addition, we cannot avoid the plain language or meaning of section 78.1—22, or redraft the provision to create an exception where none exists, in order to find statutory permission for the developers' rehabilitation here.

In light of these considerations, we conclude that the trial court erred in entering judgment in favor of the developers with respect to the neighbors' argument that the developers' rehabilitation of the Ellis structures will violate section 78.1—22 of the Chicago Municipal

Code because the outer courts will only be 4 feet in width.

■■■ The neighbors also maintain that the developers' plans with regard to the Ellis structures' basement units violate the Chicago Municipal Code because they provide no method for rendering the basement apartments impervious to water leakage in conformity with section 78.1—22(c) of the rehabilitation code. (Chicago Municipal Code, ch. 78.1, sec. 78.1—22(c) (1983).) At the hearing the neighbors presented evidence that the basements in the Ellis structures are not currently impervious to water leakage. The trial court entered a directed judgment in favor of the developers at the close of the neighbors' case with regard to this aspect of the neighbors' allegations in count III.

The developers do not dispute that the plans they submitted to the city in order to obtain their building permits fail to indicate any procedures for rendering the Ellis basement apartments waterproof. Instead they claim essentially that there is nothing to suggest that their rehabilitation of the Ellis structures will not, in fact, render the apartments' condition in conformity with the rehabilitation code.

In our view the neighbors' evidence was sufficient to establish that the developers' rehabilitation will not render the basement units in conformity with section 78.1—22(c), as the developers' plans indicate nothing to render the units impervious to water. Under these circumstances, we conclude that the trial court erred in entering a directed judgment in favor of the developers at the close of the neighbors' case with respect to the neighbors' claim that the Ellis structures' rehabilitation will not comply with section 78.1—22(c) of the Chicago Municipal Code.

We note that the neighbors also argue that the sanitary sewer pipe specified in the developers' plans for the Ellis structures does not conform to the Chicago Municipal Code. Our review of the record indicates that the court dismissed the neighbors' complaint without prejudice so far as it related to the size of the sanitary sewer pipe at the Ellis Avenue buildings. As a result we do not address the parties' claims with regard to this aspect of the proposed development.

BASEMENT APARTMENTS IN THE WOODLAWN STRUCTURE

■■■ The neighbors argue that the developers' plan to repair the basement apartments in the Woodlawn structure for residential purposes violates the rehabilitation code and the building code because the floors of the units will be more than 2 feet below grade.

Section 78.1—3 of the rehabilitation code provides in pertinent part that "[w]here there are not specific provisions in this article [*i.e.,*

the Rehabilitation Code] applying to the repair, alteration of, [or] additions to *** any existing building or structure or part thereof, then such building or part thereof shall be made to comply with the pertinent provisions of this Code for new buildings or structures." (Chicago Municipal Code, ch. 78.1, sec. 78.1—3 (1983).) As noted by the developers, there is no provision in the rehabilitation code that pertains to repair of basement units for residential purposes in general. (*Cf.* Chicago Municipal Code, ch. 78.1, sec. 78.1—29 (1983) (basement recreation rooms not used for sleeping, in buildings of not more than three dwelling units).) Thus under the terms of section 78.1—3, the developers' rehabilitation of the basement units in the Woodlawn structure "shall be made to comply with the pertinent provisions of this [Chicago Municipal] Code for new buildings or structures." Chicago Municipal Code, ch. 78.1, sec. 78.1—3 (1983).

Basement rooms in newly constructed residential buildings are governed by section 52—7 of the Code (Chicago Municipal Code, ch. 52, sec. 52.7 (1984-85)). This section states, "Habitable rooms shall be permitted in a basement only when the floor is not more than two feet below finished grade level at all exterior walls containing openings required for natural light and ventilation." Evidence submitted by the neighbors indicated that the basement units at the Woodlawn structure will be more than 2 feet below grade.

The developers claim that section 52—7 is inapplicable because section 78—50 permits residential basement units more than 2 feet below grade when those units are rendered impervious to water leakage as required in that section. (See Chicago Municipal Code, ch. 78, sec. 78—50 (1983).) This section applies to required conditions of buildings already in existence, rather than to newly constructed structures. (See Chicago Municipal Code, ch. 78, sec. 78—1 (1983).) Thus, under the terms of the rehabilitation code, section 78—50 does not apply to the planned rehabilitation of the Woodlawn structure. (See Chicago Municipal Code, ch. 78.1, sec. 78.1—3 (1983).) As a result we determine that the trial court erred in entering judgment in favor of the developers with regard to the neighbors' claim that the rehabilitation intended by the developers would violate section 52—7 of the Chicago Municipal Code.

The developers contend that it is incongruous to require that the basement units at the Woodlawn structure be no more than 2 feet below grade when, if the developers were to add one dwelling unit to the Woodlawn building, the basement units could be more than 2 feet below grade. (See Chicago Municipal Code, ch. 78.1, sec. 78.1—22 (1983).) The developers' analysis does not take into account that if one

dwelling unit should be added to the Woodlawn structure, the building would have to conform to the provisions of the Chicago Municipal Code regarding natural light and ventilation requirements for new construction. (See Chicago Municipal Code, ch. 78.1, sec. 78.1—22(e) (1983); Chicago Municipal Code, ch. 81.1, sec. 81.1—1.4 (1984-85).) Under these circumstances, the basement units, more than 2 feet below grade, would receive the degree of natural light and ventilation which the Code deems to be appropriate. Since the Woodlawn structure is not required to comply with the current natural light and ventilation standards of Chapter 81.1, the basement units, in order to receive sufficient natural light and ventilation, are not permitted to be more than 2 feet below grade. We find no incongruity in such standards.

Based on the analysis stated above, we conclude that the trial court erred in its entry of judgment in favor of the developers with regard to the neighbors' allegations that the developers' intended rehabilitation of the proposed development would violate various provisions of the Chicago Municipal Code. As a result, the order of the trial court is reversed and the cause remanded for further proceedings consistent with the views expressed herein.

CONCLUSION

For the reasons expressed above, the trial court's entry of judgment on the pleadings in favor of IHDA is reversed and the cause remanded for further proceedings consistent with the views expressed herein. The trial court's dismissal of the neighbors' pleadings with respect to the proposed development's alleged violation of the Chicago zoning ordinance is affirmed. The trial court's entry of judgment in favor of the developers and IHDA with respect to the proposed development's alleged violations of the Chicago building code and Chicago rehabilitation code is reversed and the cause remanded for further proceedings consistent with the views expressed herein.

Reversed in part; affirmed in part; and remanded for further proceedings.

LINN, P.J., concurs.

JUSTICE JIGANTI, dissenting:

The complaint is bottomed on the notion that the *sine qua non* for the IHDA to make a loan is that the development house persons of "varied economic means." That notion emanates principally from the legislative finding and declaration contained in section 3 of the Act. I

believe that phrase should be read in a context of being exhortatory and not mandatory. The Act reads:

"It is hereby found and declared that as a result of public actions involving highways, public facilities and urban renewal projects and as a result of the spread of slum conditions and blight to formerly sound neighborhoods and as a result of high costs of heating dwelling units, and as a result of the shortage of and high cost of financing for housing, there exists within Illinois a serious shortage, of decent, safe, and sanitary housing available at low and moderate rentals to persons and families of low and moderate income. This shortage is inimical to the safety, health, morals and welfare of the residents of this State and the sound growth of its communities. Private enterprise and investment, without the assistance contemplated in this Act, is not disposed to nor can it economically achieve the needed construction of decent, safe and sanitary housing at rentals which persons and families of low and moderate income can afford, nor is it disposed nor can it so achieve the urgently needed rehabilitation of existing housing or the provision of existing housing to those persons and families at those rentals. It is therefore, imperative that the cost of mortgage financing, a major factor materially affecting rental levels in housing built by private enterprise, be made lower in order to reduce rental levels for low and moderate income persons and families; that the supply of housing for persons and families displaced by public action or natural disaster be increased; and that private enterprise be encouraged to acquire, build and rehabilitate housing which will help prevent the recurrence of slum conditions and assist in their permanent elimination by housing persons of *varied economic means* in the same structures and neighborhoods.

It is further found and declared that the serious shortage of decent, safe and sanitary housing in the State of Illinois is in large measure caused by recurring critical shortages of funds in private lending institutions available for residential mortgages at reasonable interest rates. These shortages have contributed to serious reductions in construction starts of new residential units and in rehabilitation of existing housing. The unaided operations of private enterprise have not met and cannot consistently meet the need for increased funds for residential mortgage financing.

It is further found and declared that urban growth in this

State is not taking place in an efficient and well-planned manner. Many existing and planned industrial and commercial facilities are not easily accessible to the places of residence of substantial numbers of unemployed persons. The unaided efforts of private enterprise have not met and cannot meet the needs of providing residential dwellings in conjunction with or easily accessible to such industrial and commercial facilities due to problems encountered in assembling suitable building sites, the lack of adequate public services, the unavailability of private capital for development in such areas, and the inability of private enterprise alone to plan, finance and coordinate industrial and commercial development with residential development for persons and families of low and moderate income and with public services and mass transportation facilities.

It is further found and declared that the development and provision of decent, safe and sanitary housing available at low and moderate rentals to persons and families of low and moderate income is being adversely affected, in various areas, by the failure of those areas to have adequate commercial facilities to serve the areas in which such housing may be provided under this Act. It is further found and declared that the coordinated development of commercial facilities in conjunction with housing facilities can assist in providing decent, safe and sanitary housing available at low and moderate rentals to persons and families of low and moderate income. Moreover, the provision of housing related commercial facilities will serve to provide employment, which is needed in the State because of the serious and long standing level of unemployment in the State, with the consequential reduction of public revenues and increased costs of public services.

It is further found and declared that in the absence of direct governmental subsidies the unaided operations of private enterprise do not provide sufficient resources for residential construction, rehabilitation, rental or purchase, and that support from housing related commercial facilities is one means of stimulating residential construction, rehabilitation, rental and purchase.

It is further found and declared that cost-effective construction materials and techniques can significantly reduce normal heating costs, but that the bargaining power of prospective low and moderate income tenants or owners of housing developed under this Act is insufficient to assure the utilization of such

materials and techniques, and thus to assure affordable heat to those who are the intended beneficiaries of this Act.

It is further found and declared that demolition and conversion of single room occupancy hotels has exacerbated the shortage of affordable housing for low-income persons.

Based upon the above findings and declarations it is therefore determined and declared that there exist unacceptable conditions in the State which require the creation of a body politic and corporate with power to issue notes and bonds in order to make loans for the acquisition, construction and rehabilitation of housing, community facilities and housing related commercial facilities, acquire and develop land for large-scale planned developments and new communities and, as a means of encouraging home ownership, make loans to and purchase residential mortgages from private lending institutions." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 67½, par. 303.

The essence of the IHDA is to relieve the serious shortage of decent, safe, and sanitary housing available at low and moderate rentals. In order to alleviate that shortage, the Act seeks to encourage private builders not only to provide housing but also to have adequate commercial facilities and provide employment. To read that portion of the statute that refers to varied economic means as a mandatory requirement is to place undue emphasis on only one particular aspect of the Act. The proper focus should be on the clear meaning of the findings and declarations as a whole.

In order to relieve the "serious shortage" and to "prevent the recurrence of slum conditions" the IHDA is vested with significant administrative discretion in an exceedingly complex structure. While we are dealing here with a proposition of law and not a fact to which any deference should be given to the trial court, the trial court made an observation that I believe most apt. In its ruling the court said that the IHDA does "not need the court to sit and pass judgment on the wisdom of its judgment calls." This exercise of judicial restraint by the trial court is directly in line with the recent urging of the Illinois Supreme Court in *People v. Roush* (1984), 101 Ill. 2d 355, 426 N.E.2d 468, wherein the court stated that where public officials are given discretionary administrative powers, courts are reluctant to control and review an exercise of that power.

I would affirm.